**Eugene T. ARRENDALE, etc., Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**Civ. A. No. 4–78–65.**

United States District Court, N. D. Texas, Fort Worth Division.

April 10, 1979.

Kenneth J. Mighell, U. S. Atty., and Wm. L. Johnson, Jr., Asst. U. S. Atty., Fort Worth, Tex., for defendant.

John H. Holloway, Houston, Tex., for plaintiff.

## MEMORANDUM OPINION

HAND, District Judge, By Designation.

This is a medical malpractice action instituted against the United States under authority of the Federal Tort Claims Act, Title 28, U.S.C.A., §§ 2671 *et seq.* The plaintiff sues as next friend of his son, Terrance Edward Arrendale, alleging that his son was subjected to medical treatment by doctors at Carswell Air Force Base in Fort Worth, Texas, that was not in keeping with the standard professional medical practices for the area. The defendant has denied that any of the doctors employed by it were negligent, and argued that even if they were the plaintiff suffered no compensable injury by reason thereof.

The matter came on for trial before the Court, Honorable W. B. Hand, sitting by designation, and the Court, having considered the evidence and the exhibits adduced at trial and the oral arguments of counsel, together with the applicable law, finds as follows:

## FINDINGS OF FACT

1. Terrance Edward Arrendale was born on February 15, 1967. He is the son of the plaintiff, Eugene T. Arrendale, who has brought this suit in Terrance's behalf as his next friend. The plaintiff was on active duty in the United States Air Force from June 16, 1949 to December 2, 1952, and he was in the Air Force Reserves from 1953 to 1973. Both the plaintiff and his son are residents of Corpus Christi, Texas at this time, but at the initiation of this suit and at most times relevant to this suit they were residents of Fort Worth, Texas, within this Division and District.

2. In December of 1974 Terrance Arrendale, who was almost eight years at that time, began complaining to his parents of a pain in the area of his left knee. He had not suffered any injury to the knee prior to this and neither he nor his parents were aware of the precise malady. The pains continued through the 1974 Christmas holidays and through his return to school in January of 1975, and Terrance developed a slight limp in which he favored his left leg.

3. On January 20, 1975 the plaintiff took Terrance to the emergency room at the Carswell Air Force Base [CAFB] hospital and advised an assistant physician that Terrance had been suffering from pain in the left knee and that there was some swelling. The assistant physician examined Terrance and stated that it might be a sprain or a pulled muscle, and he recommended that the leg be x-rayed. The x-rays were taken that day and the plaintiff was told they revealed a small defect in the lateral femoral condyle of the knee. The plaintiff was then instructed to obtain an appointment with one of the specialists at the CAFB hospital's Orthopedic Section.

4. The plaintiff got an appointment and Terrance was next seen on January 29, 1975 by Dr. Shiekholeslam at the CAFB orthopedic clinic. After an examination consisting only of manipulation of the leg, the doctor advised the plaintiff that Terrance was suffering only from "growing pains". The doctor told the plaintiff that there was no cause for alarm and that there would be no need to restrict Terrance's activities.

5. No further appointment was made at that time, but on February 15, 1975 the plaintiff returned to the CAFB hospital with Terrance for further examination. At this time the doctor took comparison x-rays of the right knee, and noted similar lesions to those observed in the left knee. Dr. Shiekholeslam did not conduct any physical examination of the knee, but he did advise the plaintiff, according to the plaintiff's testimony, that Terrance should be allowed to run, play and exercise with other children, placing no limitation on the physical activity.

6. The next time that Dr. Shiekholeslam saw Terrance was in the third week in March, 1975. At this time the plaintiff told the doctor that Terrance had a pronounced limp and that he was in pain from the leg ailment, which apparently was still manifesting itself in the knee area. The doctor examined the knee and observed Terrance's limp, and, according to the plaintiff's testimony, he again stated that Terrance was suffering from growing pains and that he should be taken to CAFB pediatrics clinic in about three months. The doctor did not recommend any limitations on Terrance's activities, so he continued to attend school while the limp became more pronounced and the pain heightened.

7. On May 12, 1975, Terrance returned to the CAFB hospital where he was examined by Dr. Royce Hood, another orthopedic specialist. The plaintiff told Dr. Hood about Terrance's previous complaints and pain, and informed him of the actions taken by Dr. Shiekholeslam. Dr. Hood then examined Terrance by removing his clothes, manipulating the leg in several directions, and by probing at Terrance's left hip, an exercise never conducted by Dr. Shiekholeslam. More x-rays were taken and after they were returned Dr. Hood diagnosed Terrance's ailment as hip damage resulting from Legg-Perthes Disease,[1] which the doc-

---

1. According to *Dorland's Illustrated Medical Dictionary*, the ailment is known variously as Legg's Disease or the Legg-Calvé-Perthes disease, the pathological name of which is Osteo-

tor described to the plaintiff as a deterioration of the femur head (hip ball) resulting from inadequate blood supply.

8. Dr. Hood told the plaintiff that immobilization of the joint was necessary and Terrance was hospitalized that day. Terrance remained in the hospital for 12 to 14 days, where he was placed in Buck's traction bilaterally. No surgery or physical therapy was conducted during this period. Dr. Hood recommended to the plaintiff that Terrance be put in a brace to stabilize and contain the hip joint. The brace required special construction, and Dr. Hood restricted Terrance's activities until the brace could be obtained.

9. An arthrogram conducted during this period revealed a flattening of the superior lateral aspect of the femur head with total head involvement and the appearance of the regenerative stage of the disease. X-rays taken during this period revealed a complete involvement of the femur head with minimal deformity.

10. On June 11, 1975 Terrance was readmitted to the CAFB hospital for approximately a three week period. During this time Terrance was fitted with a trilateral socket brace. On July 29, 1975, Dr. Hood conducted a surgical procedure consisting of removal of some tendons in the groin area so that Terrance would be able to flex his left leg in the brace at a greater angle to aid in working the femur head back into its proper place in the hip socket. Dr. Hood described the procedure as a "percutaneous abductor tenotomy to relax the abductor tendons to obtain a better seating of the femoral head into the acetabulum." Following this stay in the hospital, Dr. Hood left the service and did not treat Terrance again.

11. Terrance's next trip to the CAFB hospital was on September 10, 1975, when he was seen by Dr. Walter Harris for adjustment of his brace. From that visit to the present Terrance has continued to have substantially the same limp, although he has apparently learned to compensate for it better. He has continued to suffer pain in the hip area for short durations, and the only medication prescribed has been aspirin. Terrance's left leg, as a result of the disease, is somewhat shorter than his right leg, and continued deterioration, if it occurs, could require surgery to shorten the right leg in the future.

12. On June 21, 1976 Terrance was seen by Dr. Ira Yount of the Wilford Hall Medical Center in San Antonio, another Air Force facility that specializes in children's orthopedic problems. Dr. Yount conducted his examination by flexing, rotating, and measuring the hip area, and he made a computation from x-rays of the width of both of Terrance's legs. Dr. Yount conferred with other doctors at the facility and all agreed that nothing could be done other than a follow-up examination every six months. No restrictions were put on Terrance's physical activities since the doctors concluded that the period of the greatest stress had passed. Since June 21, 1976 Terrance has been examined by various doctors at the San Antonio facility on four occasions, including shortly before the trial of this matter.

13. At the time of trial Terrance continued to suffer from a limp that restricts him from involving himself in typical children's activities, he often feels pain after a quick movement or after sitting in the wrong position, and he cannot raise his left leg while sitting. The medication that has been prescribed for him is aspirin. In his present condition he has suffered great frustration from his inability to participate in sports, and from the teasing that he often encounters from other students at school. All parties involved agree and understand that there is a distinct possibility that further surgery may be required when Terrance reaches adulthood to repair the disintegrating femur head, and possibly surgery early on to shorten the right leg should it show evidence of growing to be

chondritis demormans juvenilis. It was named for Arthur T. Legg, a Boston surgeon; Jacques

Calvé, a French orthopedist; and Georg Clemens Perthes, a German surgeon.

more than one inch longer than the left leg (it is presently about one-half inch longer).

14. Dr. Yount describes Legg-Perthes disease as one of unknown etiology whose pathology is known to be a vascular demise with resulting necrosis to the femur head or, in layman's terms, death and disintegration of the hip ball resulting from cessation of the blood flow to the hip ball area. The disease was previously considered infectious but this has more recently been ruled out. Dr. Yount testified that to pinpoint Legg-Perthes Disease a doctor should look for pain in the hip, a limp resulting from this pain, and a restriction of movement. Dr. Yount further testified that in some cases knee pain such as that suffered by Terrance is the first symptom of the disease, and that a diligent doctor who failed to find a basis for knee pain in x-rays should consider the possibility of the disease, which Dr. Yount has always done.

In a case of an eight year old child with a three or four week old limp who suffers knee pain without any evidence of an injury, Dr. Yount concluded that there would be a suggestion of Legg-Perthes Disease and that diagnosis would be aided by an examination of the hip rotation and motion and by an x-ray examination of the hip.

Prior to his testimony Dr. Yount reviewed the reports of Dr. Shiekholeslam. Dr. Yount opined that Dr. Shiekholeslam checked Terrance's hips, since he noted in his second report that there was a noticeable limp but no limitation on hip mobility. Dr. Yount testified that he would have examined Terrance for Legg-Perthes Disease on the first visit, but he admits that he could not now state whether the examination would have revealed the ailment. The Court finds by the preponderance of the evidence that Dr. Yount viewed the efforts of Dr. Shiekholeslam as inadequate in view of the circumstances.

15. Dr. Yount testified that the appropriate treatment for Legg-Perthes Disease is determined by the age of the patient, the extent of the hip involved, and the individual preference of the surgeon involved. He describes the basic treatment as contain-ment of the head in the hip socket, the feasibility of which depends upon the extent of the femur head involvement. Where containment is feasible by use of a brace, Dr. Yount supports the type of tendon removal surgery as was conducted by Dr. Hood.

■ Dr. Yount describes two types of containment: brace implacement and surgery. He states that there is about a 50%/50% split in the preference of orthopedic surgeons, and that while he is a surgery advocate he firmly believes that there is no impropriety in the medical treatment afforded by the brace implacement enthusiasts. Since brace implacement is medically acceptable to 50% of the orthopedic surgeons, the Court finds no negligence in its use by Dr. Hood in this case.

16. Dr. Yount testified that once the femur head disintegration begins in a child eight years of age there is a 50% to 75% chance of normality if the problem is caught in time. However, the extent of femur damage is determined at the onset of the malady. Dr. Yount further states that if Dr. Shiekholeslam had accurately diagnosed the ailment in January of 1975 there would be no greater chance of recovery, since the femur head was already in a non-arrestable degenerative stage at that time.

17. Dr. Yount last examined Terrance on March 20, 1979, shortly before the trial of this matter. Dr. Yount's opinion is that Terrance does not have complete growth arrest in his leg, but rather that the joint will stabilize and leave his left leg one-half inch shorter than his right. He would advise Terrance, however, for the future to seek employment where he will not have to walk much and is not required to exert himself too much for he will have increasing hip disability.

18. The only other live medical testimony at trial was provided by Dr. John D. Harmon, an independent orthopedic surgeon who prior to trial had reviewed most of Terrance's medical records. Dr. Harmon has had previous experience with Legg-Perthes Disease in his career among some

of his patients. He states that the onset of the disease results in a progression of the necrosis, or dying of the bone. He describes the cure for the disease as revascularization—restoration of the blood flow to the femur head. Relying on the medical records and the deposition of Dr. Shiekholeslam, Dr. Harmon reassured that the treatment Terrance received from the Air Force physicians did not deviate from the medically acceptable norm for treatment of Legg-Perthes Disease.

19. Dr. Harmon also testified with respect to the treatment he would follow for Legg-Perthes Disease. Where the symptoms indicated even a possibility of the disease, he would prescribe immobilization whether he had taken x-rays or not. Dr. Harmon feels that Dr. Shiekholeslam would have erred in discharging Terrance on January 29, 1975 had he known Legg-Perthes was involved, and that Dr. Shiekholeslam failed to adequately treat Terrance on February 20, 1975 since he failed to take x-rays to determine the possibility of the disease. Dr. Harmon would not personally have diagnosed the ailment as growing pains, nor would he have encouraged physical activities, since this might enhance the severity of the problem. However, Dr. Harmon testified that the damage is done at the time that the blood is first lost from the femur head, and that there is no adequate treatment during the degenerative stage that the femur head was in at the time that Dr. Shiekholeslam was ministering to Terrance. Thus, Dr. Harmon does not feel that the delay in treatment resulting from Dr. Shiekholeslam's misdiagnosis caused any damage to Terrance, nor does he think it likely that the delay resulted in any increased pain or suffering to Terrance.

20. Dr. Harmon was unable to testify whether any damage occurred between February and May of 1975, since he had no x-rays of the hip prior to May of 1975. He testified that the proper medical treatment in May of 1975 was containment, for which there is no generalized treatment. He further stated that brace implacement is a medically recognized treatment for containment, and that thus the actions of Dr. Hood did not violate medically acceptable practices.

Upon examination of later x-rays taken in January of 1976, Dr. Harmon noted that full containment of the head had not been achieved. In view of this he doubts that any further regeneration is possible, but would recommend that treatments should be continued. He reviewed later x-rays taken in December of 1976 and upon comparison noted identical degeneration. From the most recent x-rays Dr. Harmon agreed that Terrance will in the future require a covering procedure involving cup installation or possibly even total hip replacement.

21. Legg-Perthes Disease is a four step process involving initially the necrosis stage in which the blood flow ceases, next a degenerative stage involving disintegration of the femur head from lack of blood, then a regenerative stage, hopefully, where the blood flow is reinstated and the femur head resumes growth, and, finally, in a few cases, a restoration stage in which the femur head achieves its proper place in the hip socket. The medical testimony in this case reveals clearly that treatment for the disease is not available in the degenerative stage beyond containment of the head in the socket, and that regeneration cannot be externally initiated. Accordingly, the Court finds that any treatment or lack thereof during the degenerative stage cannot be made the basis of a claim for permanent injury.

22. Dr. Mehdi Shiekholeslam is a 46 year old physician who specializes in orthopedic surgery. He was born and reared in Iran, and he completed his medical training at the Shiraz Medical School there. After arriving in the United States he interned at Cook County Hospital in Chicago, Illinois and completed one year of general surgery residency at Baroness Erlanger Hospital in Chattanooga, Tennessee. Since then he has completed 2½ years of orthopedic surgery in Columbia, South Carolina and six months of post graduate training at Northwestern University in Chicago. The doctor has been licensed to practice medicine in Texas since 1974. Since he has been practicing in Texas

the doctor spent two years with the Chester Clinic in Dallas and the time after that as an orthopedic specialist àt CAFB hospital in Fort Worth. During the time that the doctor worked at CAFB, he was a private physician under contract with the Air Force drawing a monthly salary for his efforts.

Dr. Shiekholeslam testified by deposition that there was nothing revealed by the assistant physician's examination of January 20, 1975 that would indicate that Terrance Arrendale might be suffering from Legg-Perthes Disease or some other hip malady. The doctor opined that the use of physician's assistants results from the Air Force's attempts to keep costs down, and that such procedure tends to lower the quality of diagnostic care available to patients.

The doctor admitted that where a young man has a six week to three month history of leg pains the physician ought to be alerted to a problem in the hip area, since hip problems are often referred to the knee via the obturator. Dr. Shiekholeslam did not consider Terrance's hip on the initial visit because he complained of left knee pain and he had a "fairly good range of motion of the joints of hip." When he first x-rayed the left knee he noticed an osteophyte formation, which he concluded might be pathologic and a disease. However, x-rays of the right knee revealed the same type of lesions so the doctor concluded that there was no abnormality in the left knee.

The second time Dr. Shiekholeslam saw Terrance he had a definite limp favoring his left leg. The doctor is very confused with respect to the dates involved, but it appears to the Court that this visit was on January 29, 1975. Also, he complained at this time of pain in the left thigh. While the movement of the pain localized the area of pain in the hip joint, the fact that the range of motion in the hip was normal for an overweight boy like Terrance dissuaded the doctor from concluding that there were any hip problems.

Dr. Shiekholeslam's final examination of Terrance was on February 27, 1975,[2] and Terrance continued to have pain in the left leg and a limp, which persuaded the doctor that there was some hip involvement. At this time the doctor diagnosed possible transient synovitis, which is an inflammation of the inside of the hip joint and in 15% of the cases amounts to the beginning of Legg-Perthes Disease. According to the doctor's testimony, for this reason he ordered crutches for Terrance and told him to return in two weeks. The doctor stated this was the first time that he considered that he might be dealing with Legg-Perthes Disease. In spite of this consideration the doctor did not make any hip x-rays to ascertain the possibility of the disease, since he was concerned about taking x-rays so close to the testicles. Finally, after this examination, Dr. Shiekholeslam took the matter up with three other orthopedics at conference and they concurred in his diagnosis of transient synovitis and the therapy prescribed. After the examination the doctor expressed his concern over Terrance's hip to the plaintiff without mentioning the possibility of Legg-Perthes Disease, and he told the plaintiff that Terrance would need to be re-evaluated every three months. The doctor planned to x-ray the hip on the next visit.

With respect to generalized treatment of Legg-Perthes Disease Dr. Shiekholeslam testified that early treatment is very important because such treatment aids in preventing head deformity that leads to arthritic changes in later life. Thus, the earlier the diagnosis, the greater the chance for lessening the potential permanent injury; indeed, while he states that it is unusual, in some cases early treatment can lead to regeneration of the femur head and thus avoid permanent injury. The doctor testified that for this reason he prescribed the use of crutches, concluding that putting the left hip in a non-weight bearing status would aid recovery. This status should be continued for as long as the pain manifests

**2.** The deposition of Dr. Shiekholeslam reveals that he has very little grasp of the dates involved in this suit. Other testimony was that the final examination was on February 15, 1975. The precise date, however, is not material to the outcome of this lawsuit.

itself, with examinations every three months.

Dr. Shiekholeslam disagrees with the percutaneous abductor tenotomy performed by Dr. Hood, contending that such surgery is not a necessary treatment for Legg-Perthes Disease and that it does not aid range of motion. However, this testimony is in direct conflict with that of Doctors Hood, Yount, and Harmon.

23. Dr. Royce Hood also testified in this matter by disposition. He is a 37 year old orthopedic surgeon who presently practices in DeLand, Florida. The doctor received his M.D. degree from Emory University in 1967 and had a year's internship in an Atlanta, Georgia hospital. He further had four years of orthopedic residency at Wilford Hall Medical Center in San Antonio, Texas. At all times relevant to this suit Dr. Hood was an orthopedic surgeon at CAFB hospital in Fort Worth, Texas.

Dr. Hood first examined Terrance on May 12, 1975. At that time he made the following notation:

Eight year old male with chronic pain in left knee, thought secondary to osteochondritis dissecans. Now complains of left hip pain.

Physical exam, tender in the region of the hip, limited flexion and rotation. Antalgic limp. No effusion in knee.

Diagnosis, left hip pain, undetermined etiology. Admit.

The diagnosis was "left hip pain, secondary to Legg-Perthes Disease with a total head involvement, lateral sublexion of the femoral head." At this time Dr. Hood concluded that the disease was in the regenerative stage where the cell death had already occurred and the bone tissue was reforming, although he admits that his analysis was speculative.

Dr. Hood states that a physician confronted by a juvenile with a painful limp without any history of traumatic injury ought to consider the possibility of Legg-Perthes Disease, even if the pain is not localized in the hip. Dr. Hood questions the treatment provided by Dr. Shiekholeslam on the ground that he didn't x-ray the hip

in spite of the external evidence. Dr. Hood further stated that he thinks that some degree of damage to Terrance might have been averted had he been immobilized earlier than he actually was, since early treatment is necessary. Had he been the treating physician, Dr. Hood states that he would have x-rayed the hip on the February 27, 1975 examination for later comparison, if for nothing else. Additionally, Dr. Hood would have prescribed bed rest for immobilization instead of crutches. Finally, Dr. Hood testified that his opinion is that every step Terrance took between February and May of 1975 had some deforming force on the femoral head, although he can't speculate on the extent of the damage caused thereby.

Dr. Hood's testimony agrees with all of the other medical testimony in this case that the medical belief is that the extent of femoral head involvement in Legg-Perthes Disease is determined in the initial necrosis stage—the extent of femoral head damage is dependent upon the amount of blood lost during necrosis. He also agrees with Dr. Yount that early diagnosis of the malady would provide a 50% probability of regeneration of the femoral head.

Dr. Hood testified that he performed the tendon removal surgery because Terrance was having a difficult time using his brace. He stated that "the brace had his leg abducted or pulled away from the body so that the femoral head would be seated in the socket. He was having a lot of spasm in the muscles on the inner aspect of the leg and hip called the adductor muscles." The procedure made it easier for Terrance to keep his left leg away from the body and thus keep the hip reduced in the socket. The evidence is clear that the surgery was not performed as treatment for the Legg-Perthes Disease, but rather was intended to facilitate the immobilization function of the brace.

## CONCLUSIONS OF LAW

1. This Court has jurisdiction over the subject matter of this lawsuit and the par-

ties hereto by virtue of Title 28, U.S.C.A., § 1346(b), since this is an action properly pursued under the Federal Tort Claims Act, Title 28, U.S.C.A., §§ 2671 *et seq.*

2. The physicians and other employees of the CAFB hospital were servants of the defendant United States and were acting within the course and scope of their employment at all times pertinent to this litigation.

■ 3. Although this suit is brought in federal court on a federal cause of action, the substantive law of the State of Texas is controlling with respect to the liability of the defendant United States. *See United States v. Muniz,* 374 U.S. 150, 83 S.Ct. 1850, 10 L.Ed.2d 805 (1963); *Richards v. United States,* 369 U.S. 1, 82 S.Ct. 585, 7 L.Ed.2d 492 (1962).

■ 4. Under Texas law the plaintiff has the burden of proving what is the recognized standard of medical care in this or in a similar community as would be exercised by a physician in the same speciality under the same or similar circumstances, and the burden of proving that the physician or physicians in question departed from this proven standard of treatment and care. *Edwards v. United States,* 519 F.2d 1137 (5th Cir. 1975); *Karp v. Cooley,* 493 F.2d 408 (5th Cir. 1974); *Watson v. United States,* 346 F.2d 52 (5th Cir. 1965). Under the allegations in this case, the burden falls on the plaintiff to establish by a preponderance of the evidence that the medical treatment afforded Terrance Arrendale by either Dr. Shiekholeslam or by Dr. Hood, or by both of them, failed to conform to the proven standard of treatment and care, and that this failure was the proximate cause of the injuries sustained by Terrance Arrendale.

■ 5. Turning first to the evidence as it relates to the treatment rendered by Dr. Hood, the Court is of the opinion that the plaintiff has completely failed to establish that such treatment deviated to any extent from the recognized medical standard of treatment. The doctor diagnosed Legg-Perthes Disease on his first examination

and immediately admitted the boy into the hospital to immobilize the hip joint in hopes of containing the femoral head. He later prescribed a brace to assist the containment, a procedure supported by about ½ of the orthopedic surgeons in the country. The only thing that Dr. Hood did that may have deviated from the norm was the percutaneous abductor tenotomy he performed. From the evidence presented to the Court, the Court is of the opinion that the surgery was performed pursuant to a bona fide medical decision that utilization of the abduction brace would be facilitated, so the allegation that such surgery is not a recognized treatment for Legg-Perthes Disease is overcome. Clearly, the surgery was not in treatment of the disease, but rather to facilitate the chosen cure. Accordingly, the Court is convinced that the plaintiff has failed to establish that Dr. Hood was in any way negligent in this treatment of Terrance Arrendale.

■ 6. The Court's analysis with respect to the actions of Dr. Shiekholeslam is not quite so simple. The evidence is clear that a competent physician observing a young male with a limp and leg pains ought to be put on notice that a possibility of Legg-Perthes Disease exists, and, with such notice, ought to conduct x-ray examinations of the hip joint to facilitate consideration of whether the disease is present. In the instant case the doctor failed to take such x-rays due to his concern that x-rays might serve to enhance a testicular problem in the youth. The Court is of the opinion that this was not a sufficient justification for failure to x-ray in view of the severity of the disease and the medical testimony revealing that early diagnosis and treatment are critical to any hopes of complete or substantially complete restoration of the femoral head. On this basis, the Court is of the opinion that Dr. Shiekholeslam was negligent in his treatment of Terrance Arrendale for failing to correctly diagnose and treat Terrance for Legg-Perthes Disease in a situation in which standard medical procedures would or should have revealed the existence or likelihood of the disease.

■ The simple finding of negligence does not terminate the burden placed on the Court in this matter. It is incumbent upon the plaintiff to establish by a preponderance of the evidence that the doctor's negligence was the proximate cause of injuries that he has suffered. The Court is convinced that the plaintiff has failed to carry his burden on this point.

■ The evidence presented to the Court reveals that Terrance Arrendale has a permanent disability and that he has a substantial possibility of facing future corrective surgery. The evidence also established that Terrance has suffered some mental anguish in the nature of frustration in his inability to play sports or other games played by other children, and from the teasing he has encountered from other children. The question for the Court is whether these damages were proximately caused by the proven negligence of Dr. Shiekholeslam. The Court thinks not.

The medical testimony is clear that the damage done by Legg-Perthes Disease is determined in the necrosis stage when the blood loss to the femoral head first occurs, and that the extent of the damage is closely tied to the amount of blood lost. The Court would be inclined to place the blame for Terrance's injuries on Dr. Shiekholeslam and find liability had the evidence revealed that the disease was in the regenerative stage at the time the doctor treated Terrance, but this is only one of two inferences that might be drawn from the evidence. The other inference is that the femoral head was in the degenerative stage during this period, a stage for which there is no effective treatment and in which the only thing the doctor can do is to immobilize the hip in hopes of easing the discomfort until the femoral head reaches the regenerative stage. The second inference is more plausible, since Terrance's pains began almost two months prior to his first visit to the CAFB hospital and the medical probability is that the femoral head was at that time in the degenerative stage. Thus the defendant would be liable to the plaintiff only for those injuries or damages suffered between the time Dr. Shiekholeslam should have diagnosed the disease on February 15 or 27, 1975, and the time that the disease was properly diagnosed on May 12, 1975.

On this point, the Court is again of the opinion that the plaintiff has failed to carry his burden of proof. The only evidence of injury is that Terrance was in pain during this period. This is of little probative value because he was in pain prior to this period and remains in pain today, four years after the incident. Terrance was not able to articulate on the stand any greater degree of pain that he suffered during this period. Dr. Hood opined that each step taken during this period intensified the damage to the femoral head, but this opinion contradicts other testimony by him and by two other doctors that the extent of the damage is determined by the extent of the blood loss during the necrosis stage. On the basis of this, the Court is of the opinion that Terrance Arrendale suffered no injury proximately resulting from the negligence of Dr. Shiekholeslam, and is entitled to no relief therefor. Accordingly, judgment in this case is due to be entered in favor of the defendant.