John Thad SCOTT, Jr., Appellant,

v.

Richard E. LEIGH, Jr., Appellee.

No. 3667.

Court of Civil Appeals of Texas.

Eastland.

March 16, 1962.

John Thad Scott, Jr., Houston, for appellant.

Andrews, Kurth, Campbell & Jones, Fulbright, Crooker, Freeman, Bates & Jaworski, Houston, for appellee.

COLLINGS, Justice.

This is a malpractice case. John Thad Scott, Jr., brought suit against Dr. Richard E. Leigh, Jr., for damages allegedly resulting from negligence and malpractice. Plaintiff alleged that he sustained injuries to one or both of his eyes as a result of an examination on January 14, 1959, and subsequent treatment by the defendant. An instructed verdict was granted against plaintiff when he rested his case. Plaintiff had offered no testimony from expert witnesses of any negligence on the part of the defendant. Plaintiff, John Thad Scott, Jr., has appealed.

It is contended in appellant Scott's first two points that the court erred in sustaining appellee's motion for an instructed verdict. He urges that there were issues of fact presented by the testimony of appellant and other witnesses which should have been submitted to the jury. In appellant's 3rd point of error it is contended that the court erred in failing and refusing to submit to the jury the following or similar issues of fact: (1) Whether appellee, after being advised by telephone that appellant's eyeballs were inflamed and his eyelids swollen, without examination of appellant, prescribed medication which contained the same ingredient or ingredients that had been used in appellant's eyes prior to and after the examination, (2) whether the prescribing of such medication, under the circumstances, was negligence, (3) whether such negligence was the proximate cause of injury to appellant's eyesight, and (4) the amount of money which, if paid in cash, would fairly compensate appellant for such injuries to his eyes.

The evidence indicates that in 1933 appellant, John Thad Scott, Jr., began to have difficulty with his eyes, and the trouble was diagnosed as bilateral cataracts, the right eye most advanced. For a period of about two years appellant principally used his left eye. In June of 1941, an operation was performed on his right eye and in 1944 there was an operation on his left eye. During the three years intervening between the operations, appellant had use of his right eye only, in performing service as regional attorney for the National War Labor Board in Dallas. The evidence shows that after the operation on appellant's right eye he developed a severe case of eyeritis which for a period of about thirteen weeks was very painful but that the infection was burned out by a fever therapy administered by a competent physician. It was indicated that there was fear for some time that appellant might lose the sight of his right eye but that finally 20/20 vision was obtained and he used that eye alone as above indicated for about three years. The operation on appellant's left eye in 1944 was successful and he was able to be back on his job in Dallas within a month. About the middle of 1952, when appellant was in Washington on the National Mediation Board, he discovered that he was doing his close reading with his left eye only. Even prior thereto, it was apparent that he had lost the 20/20 vision in his right eye.

Appellant contends that Dr. Leigh was negligent in the treatment of his eyes but

admits that the doctor is a competent ophthalmologist and is recognized as such by the profession and the public. Dr. Leigh had treated a serious eye condition of appellant's sister and because of her recommendation and the desire of his wife he arranged for an examination by Dr. Leigh in the fall of 1958. Mr. and Mrs. Scott testified that when appellant went to Dr. Leigh to have his eyes examined, he simply wanted to see if the doctor could improve the lens and increase the vision of his right eye or if anything could be done to help the weakened eye.

The alleged negligence of Dr. Leigh which appellant claims proximately caused the injury to his eyes was the use by the doctor of certain drugs in his eyes during examination and the prescription of certain medicine for the treatment of his eyes without making adequate tests to determine whether appellant would suffer from an allergy or have any other bad reaction therefrom. Appellant also alleged that the doctor was negligent in failing to direct appellant to promptly return to his office for treatment when he learned from his nurse, the afternoon following the examination that appellant was suffering because of an allergy and other ill effects from the drugs used during the examination that morning.

Prior to the use of any medication in Mr. Scott's eyes at the time of the examination he and Dr. Leigh discussed the question of possible allergy and Mr. Scott stated that he had no such problem. Mr. Scott stated that he had not had any medication used in his eyes since 1944. In the examination, Dr. Leigh used first a drop of anesthetic, dorsacaine, and then a drop of neo-synephrine, to relax the pupil. After the examination Dr. Leigh put in another drop of dorsacaine and another drop of neo-synephrine. Mr. Scott was apprehensive at the time of this examination.

Mr. Scott testified that after the doctor had examined his eyes and had placed drops in his eyes the second time and he was sitting in the anteroom waiting until the nurse said he could go, his eyes began to smart and the discomfort seemed to increase; that when he was leaving the doctor's office his eyes were smarting so bad that he returned and asked the nurse if she could get the doctor to give him a prescription for it. Scott stated that after he left the doctor's office, his eyes continued to get worse and by the time he got to the drug store and had the prescription filled, they were bothering him considerably; that the discomfort was so pronounced that when he got home he called the doctor's office and talked to the nurse and informed her that his eyeballs were inflamed and that his eyelids were swelling and asked if he should return to the office; that the nurse advised him that the doctor said just to take the prescription that had been given to him. Mr. Scott stated that he used the prescription about three times from 2:00 o'clock in the afternoon until he went to bed that night; that his eyes continued to get worse; that the eyeballs were getting more red and the lids continued to swell; that they were very sensitive to touch and that he developed a dull headache; that he took the prescription again on awakening the next morning but the condition of his eyes continued to grow worse and he did not use the prescription any more. He returned to the doctor's office that afternoon for another examination and the doctor gave him two entirely different prescriptions. One was a salve to be applied to his swollen lids and the other was drops to be used on the inflamed eyeballs. By that time his eyes were very sore. However, with the use of the new prescriptions, they began to improve gradually but steadily. In about a weeks time, the swelling was out of the eyelids, but he had to have the prescription for the eyeballs renewed several times. Scott testified that for about a week he had no use of his eyes, could not read the papers or see the headlines, couldn't see television and just sat around the house "moping and taking the prescriptions."

■ Appellant concedes that it is the recognized rule in Texas that proof of negligence by a professional medical practitioner must be established by the testimony of expert witnesses in the same school in the vicinity by the standard of what constitutes accepted and approved practices. See Bowles v. Bourdon et al., 148 Tex. 1, 219 S.W.2d 779, 13 A.L.R.2d 1. In the instant case there was no testimony from any expert witness except the doctor himself. Appellant contends that the rule of law requiring the use of such expert witnesses is applicable only when questions involving the skill and ability of a medical practitioner are involved; that otherwise, a doctor is susceptible of being negligent the same as any other individual. In support of this contention appellant relies upon the case of Humphreys v. Roberson, 125 Tex. 558, 83 S.W.2d 311. Appellant contends that under the holding in the cited case, where the factual situation is simple enough for an ordinary layman to pass upon it, the determination remains for the jury; that where, as in this case, the doctor uses medication in the examination of a patients' eyes, when he knows that none has been used by other doctors for many years, and where the doctor refuses to permit his patient to return to his office on the day of the examination after he has been informed that the patient's eyeballs have been inflammed and his eyelids were swelling, and under these circumstances to prescribe treatment for the patient over the telephone, and particularly when the doctor prescribed medication which contained the same ingredients, or at least one of them, as did the drops which he had directed to be placed in his patient's eyes at the time of the examination, and should have had knowledge that plaintiff's eyes were allergic thereto, and where the doctor prematurely dismisses the patient after treating the injuries to his eyes, as in the manner above set out; that such evidence presents a jury question concerning negligence of the doctor.

In the Humphreys case the doctor treated a patient for trachoma. The treatment involved the application of an electrical current to the eyelids. The plaintiff patient claimed that in said treatment the doctor, not only applied the electrical current to the eyelids but also touched the eyeballs with an electrode thereby causing blindness. The defendant doctor denied that he had touched the eyeball with the electrode but, further testified that it would be dangerous and improper to apply electricity to the eyeball. The doctor testified that application of electricity to the eyeball in sufficient quantity to put the eye out was certainly not proper treatment; that it would be a serious mistake and would be grave carelessness and recklessness if it should be done. The jury found, however, that the doctor did touch his patient's eyeball with the electrode and it was held by the court that according to the testimony of the doctor, himself, his act constituted negligence. There is no such testimony by Dr. Leigh in the instant case.

Dr. Leigh testified that he was not sure that Mr. Scott is allergic to any of the medications used on him. The day following the examination Dr. Leigh skin tested Mr. Scott for sensitivity to dorsacaine and to myelochlorphene, but not to neo-synephrine. The skin tests did not reveal any allergy. The doctor testified that the possible causes of the condition of Mr. Scott's eyes were apprehension or normal irritation which would have occurred as a result of the thorough and extensive examination of the eyes, or the use of some unprescribed preparation at home, or an allergic drug reaction of such a low degree that the skin test in Dr. Leigh's office did not reveal the sensitivity.

Subsequent to the completion of the eye examination at approximately 11:00 a. m. on the morning of January 14, 1959, Mr. Scott advised Dr. Leigh's receptionist that his eyes were smarting and a prescription was given to relieve the condition. At about 2:00 p. m. on the afternoon of Janu-

ary 14th, Mr. Scott called the nurse in Dr. Leigh's office and advised that he was suffering from his eyes and asked if he should return to the office. Dr. Leigh, through his nurse, advised Mr. Scott to use the drops which had been prescribed for him on the morning of the examination. The drops, Bufopto-Neozin, were a prescription given frequently for irritated eyes. Dr. Leigh testified: "It is not unusual, after an extremely thorough examination, for eyes to be a little uncomfortable, particularly in the case of people with a florid complection."

On the following day Mr. Scott returned to Dr. Leigh's office and the prescription given previously was discontinued when Dr. Leigh discovered that Mr. Scott apparently had an "allergic conjunctivitis of the skin" of the eyelids. Dr. Leigh testified that in his opinion such an allergic conjunctivitis which Mr. Scott may have suffered on the day after the initial examination probably was not caused by the use of any medication because an allergic condition due to medication, except in extremely rare cases, would not have occurred until 24 to 48 hours after the use of the medication; that Mr. Scott's complaints began immediately after the examination and increased in a few hours after the use of the Bufopto-Neozin.

Dr Leigh testified that in his opinion Mr. Scott was suffering immediately after the examination from "irritation that would come to his eyes after a very thorough examination with the lights"; that Mr. Scott was not told to report to Dr. Leigh's office immediately on the afternoon of the initial examination because the doctor stated it is not unusual, after a thorough examination, for patients' eyes to be tired and a little uncomfortable.

Dr. Leigh testified that as is characteristic of all persons who have had cataract operations on both eyes, Mr. Scott could count figures and see large objects without glasses. Mr. Scott's vision in both eyes without glasses was less than 20–200.

With the glasses he was wearing at the time he went to Dr. Leigh's office he could see with his right eye 20–200, which is considered to be "legally blind." With his glasses Mr. Scott could see with his left eye 20–20, which is normal. After the examination Dr. Leigh advised Mr. Scott that "there was so little change indicated in your glasses—you would not be justified in going to any expense to buy new glasses." Dr. Leigh advised Mr. Scott that the vision in his right eye could be improved.

Dr. Leigh further testified that he saw and treated patients weekly at the Lighthouse for the Blind whose eyes were poorer in vision than Mr. Scott's, and such eyes could be improved with proper lenses.

Dr. Leigh testified that when a patient first comes into his office, he uses drops in eye examination. Occasionally, he makes exceptions but not in a situation such as was presented with Mr. Scott, who had come from two excellent places, and said that he did not know the cause of his poor vision and asked "would we please look into it." Dr. Leigh stated that under the circumstances he felt obligated "to examine him extremely thoroughly and extremely carefully."

Dr. Leigh testified that he asks questions of his patients with respect to allergy, but he does not make allergy tests prior to using medication. He stated that: "There is hardly a medication used in all of medicine that will not at some time cause an allergy reaction, but they are very few." On the day following the initial eye examination Mr. Scott appeared to have "an allergic dermatitis of the skin" of the face, redness of the conjunctiva (the lining of the eyeballs), but mostly the inflammation was limited to the skin of the face, with swelling of the eyelids.

Dr. Leigh stated that where a patient has a serious eye condition and there is a question of restoring or not restoring vision, that it is most important to have

a thorough examination even though a patient might manifest some previous allergy to medication; that in such cases he would probably switch to a different medication but would continue with the examination of the patient, because the regaining of vision is far more important than an allergic reaction, which is only temporary. Dr. Leigh also stated that Mr. Scott's symptoms as reported over the telephone did not warrant an extra trip to the office of Dr. Leigh for re-examination or treatment; that he would have been delighted to have seen Mr. Scott again if the symptoms, as reported, had justified it.

Dr. Leigh was the only medical witness who testified in this case. His testimony as, in substance, above set out, considered in its most favorable light to appellant does not show negligence on the part of the doctor. Dr. Leigh did not testify to any action on his part which he stated to be negligent. His testimony on the other hand was directly to the contrary. No action by Dr. Leigh has been established, by any other evidence in this case, which Dr. Leigh testified would amount to negligence. It is at this point that the facts of the instant case are distinguished from the facts of the Humphrey's case. In that case the jury found, upon sufficient evidence, that the doctor had touched the patients' eyeball with an electrode. The doctor denied this fact but expressed his opinion that such action would be improper and would constitute negligence.

In our opinion the facts of the instant case come squarely under the rule announced by our Supreme Court in Bowles et al. v. Bourdon et al., supra, as follows:

"It is definitely settled with us that a patient has no cause of action against his doctor for malpractice, either in diagnosis or recognized treatment, unless he proves by a doctor of the same school of practice as the defendant: (1) that the diagnosis or treatment complained of was such as to constitute negligence and (2) that it was a proximate cause of the patient's injuries."

The trial court did not err in refusing to submit appellant's requested special issues or in sustaining appellee's motion for an instructed verdict. The judgment is affirmed.