Carol E. SPEER, Plaintiff,

v.

UNITED STATES of America, Defendant.

Civ. A. No. 3–79–0668–H.

United States District Court,
N. D. Texas,
Dallas Division.

March 24, 1981.

---

Larry Hayes, Law Offices of Windle Turley, P.C., Dallas, Tex., for plaintiff.

Charles D. Cabaniss, Asst. U. S. Atty., Dallas, Tex., for defendant.

## MEMORANDUM OPINION

SANDERS, District Judge.

On July 27, 1976, Jerry Speer died at Parkland Memorial Hospital in Dallas, Texas, as a result of complications from a self-administered overdose of the drug Amitriptlyine. The difficult question which faces this Court is whether alleged negligence in treatment and services by Veterans Administration (VA) personnel at the Dallas VA hospital was the cause of Jerry Speer's suicide. Plaintiff Carol Speer, widow of Jerry Speer, asserts that her husband's suicide was a foreseeable result of the psychiatric treatment he received from Dr. George Winkelman, VA staff psychiatrist, and the drugs dispensed by VA pharmacists.

The Court is of the opinion that the facts, tragic though they be, will not support a finding of liability against Defendant United States.

On February 5–11, 1981, a non-jury trial was held in this case. Testimony from three medical experts focused on the medical history of Jerry Speer and the treatment he received at the VA. The evidence established that Speer suffered from a recurring history of depression, serious psychiatric problems and abuse of alcohol and drugs long before he had contact in 1976 with Dr. Winkelman and the Dallas VA hospital. On five occasions between 1971 and 1975, Speer received treatment at VA hospitals for depression and anxiety symptoms. His treatment included prescriptions for tranquilizers (such as Lithium and Valium), therapy group sessions, and a three week hospitalization in 1971 when he attempted suicide by drug overdose. Indications that Speer engaged in abuse of alcohol and "street drugs" (i. e., drugs not prescribed by treating physicians) are noted in his medical records for this period and are reported throughout the entire course of his treatment at the VA.

In December 1975, some eight months after his marriage to the Plaintiff, Speer sought psychiatric help at the Dallas VA hospital for a depression apparently trig-

gered by a violent domestic argument. Lithium and counseling were prescribed by a Mental Hygiene Clinic doctor whose initial impression from the intake interview was that Speer suffered from alcoholism, drug abuse and a schizoid personality. At a follow-up appointment on January 12, 1976, Speer underwent a battery of psychological tests given by the assigned VA psychiatrist, Dr. George Winkelman. Diagnosing Speer as a "paranoid schizophrenic", Dr. Winkelman concluded that he "should respond to adequate doses of anti-depressant and anti-schizophrenic medications." Winkelman prescribed Etrafon, a drug which combines a tranquilizer and antipsychotic with an antidepressant, and placed Speer in a weekly therapy group.

Over the next five months, Speer participated fairly regularly in the group therapy sessions. He continued to receive prescriptions from Dr. Winkelman for Etrafon, and subsequently other drugs, in increasing numbers and higher dosage levels. The VA pharmacy records show that Etrafon was supplied to Speer as follows:

| DATE | PRESCRIPTION | DAILY DOSAGE | TOTAL NO. OF TABLETS |
|------|--------------|--------------|----------------------|
| 1-12-76 | New | up to 3 pills | 90 |
| 2-05-76 | Refill of 1/12 | up to 3 pills | 90 |
| 2-12-76 | New | 5 pills | 150 |
| 3-04-76 | Refill of 1/12 | up to 3 pills | 90 |
| 3-06-76 | Refill of 2/12 | 5 pills | 150 |
| 4-01-76 | Refill of 2/12 | 5 pills | 150 |
| 5-18-76 | New | 12 pills | 360 |
| 5-26-76 | New | 8 pills | 240 |

From January to March, 1976, Speer's emotional condition appeared to improve and he was functioning well in both work and personal situations. At some point in April, Speer began to decline; his wife and employer perceived changes in personal grooming and work habits, with symptoms of apathy, drowsiness and slurring of speech becoming more pronounced. Concerned that her husband's condition was a result of the prescribed Etrafon, Plaintiff Carol Speer contacted the VA hospital's Chief of Staff and a United States Senator. She received assurances that a review of Dr. Winkelman's treatment of her husband indicated no problems.

Subsequently, at a May 25 meeting, Carol Speer expressed her concern to Dr. Winkel-man that Jerry was abusing Etrafon and alcohol. She advised Winkelman that she had destroyed some of Jerry's medication. Winkelman refused to remove Speer from the Etrafon treatment and offered hospitalization; Carol Speer left the VA hospital; Jerry remained behind in an agitated emotional state. After receiving emergency treatment of Etrafon at the hospital, Speer's emotional condition appeared improved, and he informed Dr. Winkelman that he had decided to see a private psychiatrist pursuant to his wife's wishes.

Later that same day, Jerry and Carol Speer visited Dr. Thomas Cook, a clinical psychologist, who recommended hospitalization for observation and treatment. The next day, however, Jerry asked Dr. Winkelman for a new Etrafon prescription, saying that he had decided to reject treatment by a private psychiatrist, and was going to separate from his wife and accept a job in Houston. Apparently assuming that Speer's supply of Etrafon had been destroyed by his wife, Dr. Winkelman gave him a prescription for 240 pills on May 26.

Thereafter, Speer again changed his mind and he entered Medical City Dallas Hospital for the period May 27–31, under the care of Dr. Jones (with whom Dr. Cook was associated). While in the hospital, Speer underwent psychological testing and was stabilized on two Etrafon a day. Upon Speer's discharge, Dr. Jones noted that he had a history of overdoses and drug abuse, and recommended continuing treatment with Lithium and therapy. On June 1, 1976, Speer saw Dr. Cook at a follow-up session. On June 10, 1976, Speer attended the VA therapy group and stated that he was abandoning treatment by VA and returning to the care of his wife. This was the last psychiatric treatment Speer received before his death.

Although the physical symptoms he had earlier exhibited appeared to abate for awhile, Speer's behavior in mid-June was once more marked by apathy, incoherence and motor problems. This was also apparently a period of domestic discord, and, under pressure from Carol to resume work

or leave home, Speer disappeared to California for a few days. Returning by June 25, 1976, Speer exhibited a perceptible improvement in appearance and physical condition. By July 7, however, this improvement had dissipated into malaise and lack of mental awareness, and Carol once more warned Speer that he would have to leave home if he did not attempt to work.

Later that same morning, Jerry called Carol at work and said that he had taken two bottles of Etrafon pills. He was still conscious when Carol and the ambulance arrived. On admission to Parkland Memorial Hospital, Speer said that he had been taking 10–12 Etrafon a day in addition to self-prescribed dexedrine, and that he had consumed 400–500 Etrafon pills that morning.

Speer remained a patient at Parkland until July 27, 1976, when he suffered a third cardiac arrest, failed to respond to further therapy, and was pronounced dead at 1:50 A.M. The Pathology Laboratory at Parkland concluded that the cause of death was attributable to complications from an Etrafon overdose. The Dallas Medical Examiner listed the cause of death as "Amitriptyline Intoxication" and the manner of death as suicide.

### Jurisdiction Over Plaintiff's Claims

■ The Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671–80 (1970) removes the sovereign immunity of the United States for tortious conduct committed by its employees acting within the scope of their employment and makes it liable in the same manner and to the same extent as a private individual. *Richards v. United States*, 369 U.S. 1, 82 S.Ct. 585, 7 L.Ed.2d 492 (1962). The Act establishes that as a prerequisite to maintaining a suit against the United States, a plaintiff must present notice of his or her claim to the appropriate federal agency. *Mack v. Alexander*, 575 F.2d 488, 489 (5th Cir. 1978). Only when the claim has been denied or six months have passed may a plaintiff bring suit in federal court on the claim. 28 U.S.C. § 2675(a).

Plaintiff filed a claim with the Veterans Administration on April 4, 1978, seeking damages on the grounds that her husband's suicide was caused by Dr. Winkelman's negligence both in prescribing excessive dosages of Etrafon and in monitoring Speer's treatment. Her claim was denied by the VA November 30, 1978, and this suit was filed May 25, 1979.

On December 31, 1980, the Court allowed the Plaintiff to amend her complaint in order to assert a claim for damages against the VA pharmacists for alleged negligence in dispensing prescriptions to Jerry Speer. The Government contests the Court's jurisdiction over this claim because the Plaintiff failed to file such a claim for administrative consideration.

■ The claim requirement serves the purpose of notifying the agency in order to (1) expedite the fair settlement of tort claims while easing court congestion and avoiding unnecessary litigation; and (2) provide fair and equitable treatment of private individuals when they deal with the Government. *Adams v. United States*, 615 F.2d 284, 288 (5th Cir.), *rehearing denied*, 622 F.2d 197 (1980). The purpose is not "to make recovery from the Government technically more difficult." *Executive Jet Aviation, Inc. v. United States*, 507 F.2d 508, 515 (6th Cir. 1974).

■ The requisite notice, therefore, informs the agency of the circumstances of the accident so that it may investigate the claim and respond either by settlement or defense. *Adams v. United States*, 615 F.2d at 289. Plaintiff's original claim provided the VA with sufficient information to conduct a full investigation and to put the Defendant on notice of the possibility of issues related to the alleged overprescription of Etrafon. Since at the time of the original claim Plaintiff was unaware of facts relating to the alleged negligence by the VA pharmacy, the Defendant's interpretation of the Act would result in an unjustified elevation of form over substance and would convert this remedial Act into a "trap for the unwary claimant." *Sky Harbor Air Service v. United States*, 348

F.Supp. 594, 596 (D.Neb.1972); *see also Locke v. United States,* 351 F.Supp. 185 (D.Hawaii 1972).

The Court concludes that it has jurisdiction over Plaintiff's claims.

### Plaintiff's Claims of Negligence

Plaintiff contends that Dr. Winkelman breached his duty of care to his patient, Jerry Speer, by prescribing excessive doses and quantities of the drug Etrafon and by negligently managing and monitoring Speer's treatment. Allegedly, Dr. Winkelman's negligence resulted in increasing psychological pressure on Speer and was a foreseeable cause of his suicide by overdose of Etrafon. The alleged negligent acts of the VA pharmacists in filling and refilling prescriptions of Etrafon without regard to dosage, frequency or quantity, are also asserted to have been a proximate cause of Jerry Speer's death.

■ Liability for medical malpractice under the Federal Tort Claims Act is controlled by State law. *United States v. Muniz,* 374 U.S. 150, 162–163, 83 S.Ct. 1850, 10 L.Ed.2d 805 (1963); *Richards v. United States,* 369 U.S. 1, 82 S.Ct. 585, 7 L.Ed.2d 492 (1962). Texas law therefore determines the proof necessary to establish the negligence of a physician or a pharmacist. *Edwards v. United States,* 519 F.2d 1137 (5th Cir. 1975), *cert. denied,* 425 U.S. 972, 96 S.Ct. 2170, 48 L.Ed.2d 795 (1976).

### A. Negligence of Dr. Winkelman

■ Texas law imposes on treating physicians a duty to exercise that degree of care which a physician of ordinary prudence and skill, practicing in the same or a similar community, would have exercised in the same or similar circumstances. *See, e. g., Bowles v. Bourdon,* 148 Tex. 1, 219 S.W.2d 779 (1949); *Bender v. Dingwerth,* 425 F.2d 378, 384 (5th Cir. 1970). This standard of care can only be established by the expert testimony of other physicians as to how a physician, or in this case, how a reasonably careful and prudent psychiatrist, would have acted under the same or similar circumstances. *King v. Flamm,* 442 S.W.2d

679, 681 (Tex.1969); *Snow v. Bond,* 438 S.W.2d 549, 550–51 (Tex.1969). To recover for injuries suffered from medical negligence, the Plaintiff must show, by expert testimony, that the psychiatrist breached the standard of care. In *Bowles v. Bourdon,* the Texas Supreme Court furnished the qualitative test to be applied to a plaintiff's evidence in a malpractice suit:

> It is definitely settled with us that a patient has no cause of action against his doctor for malpractice, either in diagnosis or recognized treatment, unless he proves by a doctor of the same school of practice as the defendant: (1) that the diagnosis or treatment complained of was such as to constitute negligence and (2) that it was a proximate cause of the patient's injuries. 219 S.W.2d at 782.

Plaintiff has not furnished such proof.

■ Plaintiff complains of a number of specific acts and omissions by Dr. Winkelman: diagnosing and treating Jerry Speer as a paranoid schizophrenic; prescribing a treatment plan of Etrafon; increasing the dosage of Etrafon to twelve pills a day; and providing access to a large number of Etrafon pills when Speer assertedly was an acute suicide risk. Putting to one side for now the question of the causal connection between these alleged failures and Speer's suicide, the principal defect in Plaintiff's case is the failure to establish by credible expert testimony that any of these acts amounted to negligence.

■ One major thrust of Plaintiff's case was that Dr. Winkelman was negligent in his diagnosis of Jerry Speer as a paranoid schizophrenic with schizo-affective features. A faulty diagnosis, however, can form no basis for a cause of action because in and of itself it results in no damage. *See generally,* Perdue, *The Law of Texas Medical Malpractice,* 11 Hous.L.Rev. 303, 304 (1974). Only when it leads to injurious delay in receiving proper treatment or leads to the administering of improper treatment that causes damages can a negligent diagnosis form the grounds for relief. *Id.*

The rationale for this policy is buttressed here. Dr. Cook, the psychologist who was one of the Plaintiff's experts, testified that he reached a diagnosis of Speer's condition different from that of Winkelman. Dr. Cook did not indicate, however, that his diagnosis would have resulted in a treatment plan markedly different from that adopted by Dr. Winkelman. The manic-depressive diagnosis reached by Dr. Cook, for example, was indicated by Dr. Hughes, the Defendant's expert witness, to be characterized by some of the same highs and lows as a schizo-affective condition. Dr. Cook's recommended treatment, furthermore, which included therapy, Lithium, and some amount of a major tranquilizer, "which could have been ... Etrafon", parallels in large part that implemented by Dr. Winkelman. The Court finds unpersuasive the testimony of Dr. Green, Plaintiff's second expert, whose trial testimony varied significantly from his deposition testimony. The Court therefore finds that Plaintiff failed to establish that Winkelman was negligent in his diagnosis.

The second major issue raised by Plaintiff is whether the Etrafon treatment prescribed by Dr. Winkelman, or the progressive increase in dosage of Etrafon levels, was negligent psychiatric treatment. The Physicians Desk Reference (PDR) states that Etrafon is indicated for the treatment of patients with anxiety and depressed moods, and schizophrenic patients with associated symptoms of depression. The Plaintiff argues, however, that Etrafon should not have been prescribed in view of the PDR contraindications for depression associated with barbiturates, alcohol or narcotics and for patients who are hypersensitive to any of its components.

However, there was no expert testimony that the prescription of Etrafon was itself negligent. Dr. Hughes pointed out that antipsychotic and antidepressant drugs are vitally necessary for the stabilization and treatment of patients with anxiety, depression and schizophrenic symptoms. In these cases, failure to treat such symptoms with appropriate medication can lead to increasingly aggravated conditions. The ironic aspect of drug therapy, as pointed out by Dr. Hughes, is that the drugs which are the best for treatment of depression are also those which are capable of killing a person by overdose.

Plaintiff asserts, however, that Speer's past history of street drug use and previous successful treatment with Lithium should have alerted Dr. Winkelman to the possible dangers of Etrafon use by Speer. The Plaintiff overlooks, however, her own testimony that from January 1976 until sometime in April 1976, Speer was on Etrafon and was coping well both at work and home. As pointed out earlier, furthermore, one of the Plaintiff's own experts, Dr. Cook, testified that appropriate medication for Speer would have included some type of major tranquilizer, such as Etrafon, and Dr. Cook's colleague, Dr. Jones, treated Speer with Etrafon while he was in Medical City hospital. The Court finds that by prescribing Etrafon Dr. Winkelman did not breach the standard of care expected of a prudent psychiatrist in these circumstances.

The dosage levels and amounts of Etrafon which Jerry Speer received raise different and more troubling questions. Dr. Winkelman initially placed Speer on a program of three Etrafon pills a day, which Dr. Hughes characterized as the average beginning dosage level. Dosage levels must be titrated to the specific needs of a patient and are usually set at a low initial level with gradual increases to reach an optimum stage. This process of titration serves the secondary purpose of identifying the dosage that meets the patient's needs while at the same time keeping undesirable side effects to a minimum. Speer's prescribed dosage was increased from three pills a day in January 1976 to five per day in February and to twelve per day in May 1976. Plaintiff alleges that Dr. Winkelman was negligent in prescribing such an excessively high dosage level for Speer and in failing to monitor Speer's adverse reactions to the Etrafon.

The first part of Plaintiff's theory is based upon the PDR abstract for Etrafon,

which states that the "total · daily dose should not exceed nine tablets." Plaintiff argues that by putting Speer on twelve pills a day Dr. Winkelman breached the standard of care set by the PDR. ·Indeed, it is questionable whether Dr. Winkelman with his six hundred patient load and fifteen minute sessions thoroughly evaluated Speer's need for such a large dosage. The doctor's own testimony that fifty percent of his patients were on Etrafon, with twenty percent on twelve pills a day, seems to reflect a philosophy of massive drug impact. Even so, the Court cannot say from the evidence adduced that Dr. Winkelman's prescribing twelve pills a day violated the norms of psychiatric practice.

Dr. Hughes testified that, although handy as a reference source, the PDR is not the authoritative final word on the use of drugs or their dosage levels, and gave some examples of therapeutic drug use which had outstripped the PDR product information. Since the dangerous component of Etrafon, furthermore,· is amitriptlyine with a maximum daily dosage level of 300 mg. or 12 Etrafon 4–25 pills a day, Dr. Winkelman's prescribed level was within the outer parameters of safe drug practice. Although both Dr. Cook and Dr. Green raised questions concerning the effects of such a large dosage on Speer, neither was prepared to say that twelve pills a day was *per se* negligent.

Plaintiff further argues that Dr. Winkelman was negligent in his failure to monitor and respond to Speer's alleged adverse reactions to the prescribed Etrafon. Plaintiff posits that Winkelman had a duty to ensure that Speer was not abusing Etrafon and that, at the least, he should have taken some action when informed by Carol Speer of her concern about Jerry's symptoms of apathy and sleepiness.

The testimony on this aspect is somewhat conflicting. Dr. Winkelman testified that Jerry Speer never appeared overmedicated to him. On the other hand, Plaintiff's testimony that Jerry's personality and physical condition did undergo a substantial change at times finds support in the testimony of Jerry's employer and Dr. Cook, who described Speer as appearing "overmedicated" on his May 25 visit.

Carol Speer testified that Jerry used alcohol, marijuana, and dexedrine· during this entire period. Speer himself indicated that he was on "self-prescribed dexedrine" upon his admission to Parkland for the Etrafon overdose. (The evidence showed that Jerry had been a drug and alcohol abuser for some years.) Dr. Winkelman was unwilling to give credence to Carol Speer's descriptions of the effects of abuse of Etrafon. Although both Dr. Hughes and Dr. Green testified that psychiatrists normally would seriously consider the report of a family member concerning a patient's behavior, no professional standard of care was established that a psychiatrist *must* accept the description and act on it.

The final, and most compelling, of the Plaintiff's allegations is that since Dr. Winkelman knew he was dealing with a patient with a serious mental disorder and for whom a risk of suicide could have been anticipated, he was negligent by making available to that patient large quantities of prescribed Etrafon. Plaintiff seeks to have the Court apply to Dr. Winkelman the duty of a hospital under Texas law "to exercise reasonable care and to safeguard the patient from any known or reasonably apprehensible danger from himself and to exercise such reasonable care for his safety as his mental and physical condition, if known, may require." *Bornmann v. The Great Southwest General Hospital, Inc.,* 453 F.2d 616, 621 (5th Cir. 1971); *Harris Hospital v. Pope,* 520 S.W.2d 813, 815 (Tex.Civ.App.—Fort Worth 1975, no writ history). The Court concludes that this rule should not apply where, as here, it is clear that the doctor could not exercise the degree of control over Speer which a hospital could exercise over a patient. The correct benchmark, and the accepted Texas rule, is that a psychiatrist owes a duty to his patient to exercise the degree of skill ordinarily employed under similar circumstances by similar specialists in the field in the same or similar communities. *See, e. g., Bowles v. Bourdon,* 148 Tex. 1, 219 S.W.2d 799 (1949).

It has been suggested by one commentator that since the danger that a patient will intentionally injure himself is one risk a psychiatrist is trained to prevent, a psychiatrist might be held liable for the voluntary suicide of an unconfined patient where, (1) he writes a prescription ordering a number of pills which could be fatal if taken in one dose, (2) the risks of suicide are great; and (3) the patient uses the pills to commit suicide. Schwartz, *Civil Liability for Causing Suicide: A Synthesis of Law and Psychiatry*, 24 Vanderbilt L.Rev. 217 (1975).

Dr. Winkelman testified that, although he was aware of Speer's previous suicide attempt, Speer never mentioned suicide to him. Dr. Hughes testified that there is a difference between acutely suicidal patients and those suffering from depression. The patient suffering from depression needs his medication in order to prevent the mental state which will contemplate suicide. From her review of the medical history Dr. Hughes concluded that Jerry Speer was not acutely suicidal. Indeed, one of the Plaintiff's own experts, Dr. Cook, testified that he did not think that Jerry was acutely suicidal during his visits. In the absence of any persuasive indicia that a known risk existed that Speer might use the Etrafon to commit suicide, the Court is unwilling to say that Dr. Winkelman had a responsibility to limit each prescription. (A lethal dose of Etrafon may be as few as twenty pills.)

The last prescription for Etrafon which Jerry Speer received from Dr. Winkelman on May 26, 1976, raises questions concerning the respective spheres of liability of Dr. Winkelman and the VA Pharmacy for errors which resulted in Speer receiving almost 600 Etrafon pills within a period of a few days. On May 18, 1976, Dr. Winkelman gave Speer a prescription for 360 Etrafon pills which, because of the VA mail dispensing procedures, was not mailed to Speer until after May 26, 1976. When Speer requested a new prescription on May 26, 1976, Dr. Winkelman apparently assumed that the pills destroyed by Carol Speer had been from the May 18 prescription and thus that Jerry Speer was totally out of Etrafon. Dr. Hughes testified that it would not be expected for a psychiatrist to monitor the Pharmacy, even if concerned about a patient's possible abuse of drugs, since reliance would be had on personal perceptions and abuse could take place with only a normal prescription amount. The Court finds that under the circumstances Dr. Winkelman's May 18 and May 26 prescriptions of Etrafon were not negligent and that his failure to check with the VA pharmacy concerning the prescriptions was not negligent.

In sum, the Court finds that Plaintiff has failed to establish that Dr. Winkelman was negligent in the light of accepted standards of care. Even if it is assumed, however, that Dr. Winkelman's treatment of Jerry Speer breached the standard of care expected of a psychiatrist in like circumstances, no liability could attach because any such negligence was not the proximate cause of Speer's death.

Under Texas law, "proximate cause" is a cause, which in natural and continuous sequence, produces the event and without which the event would not have occurred, and to be the proximate cause of the event, it should have been foreseen by a person exercising ordinary care. *U. S. for the Use and Benefit of Contractors Equipment Co. v. Trinity Universal Insurance Co.*, 457 F.2d 950 (5th Cir. 1972). Proximate cause, therefore, encompasses two elements (1) cause in fact, and (2) foreseeability. *Missouri Pacific Railroad Co. v. American Statesman*, 552 S.W.2d 99, 103 (Tex.1977). Both elements must be present. *Clark v. Waggoner*, 452 S.W.2d 437 (Tex.1970). Cause in fact as an element of proximate cause means that the negligent act or omission was a substantial factor in bringing about the injury and without which no harm would have been incurred. *Texas and Pacific Railway Company v. McCleery*, 418 S.W.2d 494 (Tex.1967). Foreseeability is satisfied by showing that the actor as a person of ordinary intelligence should have anticipated the danger to others by his negligent act. *Clark v. Waggoner, supra.* Since the Court has determined that Speer's suicide was not reason-

ably foreseeable, his intentional act of ingesting 400–500 Etrafon pills on July 7, 1976, constitutes an independent cause, and Dr. Winkelman's negligence, if any, was not the proximate cause of Speer's death.

### B. *Negligence of VA Pharmacists*

Plaintiff contends that the VA pharmacists negligently dispensed excessive amounts of Etrafon to Jerry Speer in violation of their duty under Texas law. In filling and refilling prescriptions, a pharmacist is required to exercise that high degree of care which a very prudent and cautious person would exercise under the same or similar circumstances. *Burke v. Bean*, 363 S.W.2d 366 (Tex.Civ.App.—Beaumont 1962, no writ); 21 Tex.Jur.2d, *Drugs and Druggists* § 4.

The VA Pharmacy is responsible for filling all prescriptions written by VA doctors. The pharmacy dispenses the drugs by mail or patient pickup. When a pharmacist prepares to fill a prescription, he has a computerized information packet which includes patient information, instructions on drug use, address labels, and data on authorized refills and the patient's history of such refills. Richard Russell, Chief of Pharmacy at the VA, testified that each pharmacist is responsible for reviewing these documents to ensure that prescriptions are dispensed in correct amounts, with adequate instructions and at proper intervals. Russell admitted, however, that the VA system failed to perform these functions in its handling of Jerry Speer's prescriptions since he was able to obtain refills beyond those authorized by Dr. Winkelman.

The computerized prescription system at the VA was structured to cancel earlier prescriptions when a physician wrote a new prescription for the same drug and the same patient. In Speer's case, the new February 12, 1976, prescription should have cancelled the original (January 12, 1976) prescription. On March 3, 1976, however, Speer was allowed to receive a refill of the January 12 authorization for 90 Etrafon pills. Only two days later, the VA pharmacy gave Speer a refill of the February 12 prescription for 150 additional pills without catching the recent refill. The pharmacists

thus breached their duty to monitor the refill of a patient's prescriptions and to ensure that excessive quantities of dangerous drugs were not obtained by a patient. (There is no indication that Dr. Winkelman was aware of the pharmacy's errors.)

Again, in filling the May 26 prescriptions, one of the VA pharmacists, as Russell characterized it, "must not have been doing his job." Russell testified that the pharmacists should have noticed that the May 18 prescription was being filled by mail and thus had not yet been sent out for delivery. The frequency of refills by Speer and the large amounts of pills involved should have alerted the pharmacy that a problem existed and that the May 26 prescription should not have been filled (at least, without contacting the treating physician, Winkelman).

The Court finds that the above acts, conduct and omissions of the VA pharmacy constituted a breach of the standard of care which pharmacists are required to meet. Can this negligence be deemed the proximate cause of Jerry Speer's death?

No Texas cases have decided whether a pharmacist may be held liable for a person's suicide carried out with drugs the pharmacist supplied. The majority of courts in other jurisdictions which have considered the question have found no liability, reasoning that the act of the decedent in voluntarily taking the drug, with knowledge of its effect, amounted to a new and intervening cause and thus insulated the effect of the pharmacist's negligence. When there is no reason that a pharmacist should anticipate that a substance will be used for suicide, one court concluded that a person's "voluntary, willful act of suicide" is a "new and independent agency" which severs the causation with a pharmacist's alleged negligence in making the sale of a potentially lethal substance. *Riesbeck Drug Co. v. Wray*, 111 Ind.App. 467, 39 N.E.2d 776 (1942). Death by self-destruction, therefore, is not a result which a pharmacist could reasonably be expected to foresee "solely from the sale of substances or instrumentalities with which human life can be taken ...." *Id.* In *Runyon v. Reid*, 510 P.2d 943 (Okla.1973), the Oklahoma Supreme Court refused to hold a pharmacist

**680**

liable even though he had violated a statute by refilling a prescription for sleeping pills for a schizophrenic decedent who later used the pills to commit suicide. Adopting the *Riesbeck* principle, the court concluded that there had been no showing that under the circumstances the pharmacist should have foreseen that his customer intended to use the pills to commit suicide. *See also Scott v. Greenville Pharmacy,* 212 S.C. 485, 48 S.E.2d 324 (1948); *Eckerd's, Inc. v. McGhee,* 19 Tenn.App. 277, 86 S.W.2d 570 (1935); *Johnson v. Primm,* 74 N.M. 597, 396 P.2d 426 (1964).

The Court finds that Speer's suicide constituted an independent intervening cause; the pharmacy's negligence was not the proximate cause of Speer's death.

For the foregoing reasons, the Court is of the opinion that Defendant is not liable to Plaintiff and judgment will be entered accordingly.

SO ORDERED.