Andrew SHEVAK, Jr., et ux., Plaintiffs,

v.

UNITED STATES of America, Defendant.

Civ. A. No. 4–78–359K.

United States District Court,
N. D. Texas,
Fort Worth Division.

Dec. 7, 1981.

**428**

Charles D. Yarborough, Bedford, Tex., for plaintiffs.

William L. Johnson, Asst. U. S. Atty., Fort Worth, Tex., for defendant.

## MEMORANDUM OPINION

BELEW, District Judge.

This is a medical malpractice case brought by Plaintiff against the United States of America. Plaintiff alleges that while he was a patient in Defendant's hospital, he failed to receive proper medical care and treatment and that such failure was negligence and a direct and proximate cause of his injuries and damages.

### I. Factual Background

At approximately 5:00 p. m. on May 1, 1976, Plaintiff Shevak fell from a ladder at his residence and injured his right leg. His family carried him to the Carswell Air Force Base Emergency Room at 5:55 p. m. His right leg was x-rayed and he was diagnosed as having a comminuted fracture of the distal one-third of the right tibia and fibula shaft. A chest x-ray was also taken. The AP view showed the lung fields clear and the cardiovascular silhouette unremarkable. Dr. Kenneth Guild after reviewing the x-rays, admitted Plaintiff Shevak to the hospital. Dr. Guild proposed performing surgery to set the fracture and at 7:30 p. m., Plaintiff signed Standard Form 22, Request for Administration of Anesthesia and for Performance of Operations and Other Procedures. At 8:30 p. m. Shevak was transferred to the operating room. At 9:09 p. m., Dr. Guild irrigated and debrided Mr. Shevak's wound and performed a closed reduction of the fractured right tibia. A long leg cast was then applied. The operation concluded at 10:22 p. m. and the patient returned to the ward at 2:00 a. m. on May 2, 1976.

From that point until approximately 10:30 a. m., May 9, 1976, the patient's hospitalization was uneventful. He had leg and shoulder pain during this period but gained relief from the medication given. On May 4th, he was placed on the antibiotic, Keflex, 500 mg by mouth, every six hours. Also during this period, on May 7th, at 11:30, and 6:00 p. m., and on May 8th, at 6:00 p. m., Mr. Shevak was moved from his bed to his wheelchair, where he remained for periods of up to one hour.

On May 9, 1976, at approximately 10:30 a. m. the patient, while being assisted by one attendant from his wheelchair back to his bed, complained of a sharp pain in his leg. The nurse on duty notified Dr. Guild at 10:50 a. m. and 12:00 Noon that the patient was complaining of severe pain and was not receiving relief from the medicine given.

According to the nursing notes on May 10, 1976, Mr. Shevak was taken to x-ray.

The radiographic report, however, showed that on May 9, 1976 the x-rays were, in fact, taken. The report reads:

There are severly comminuted fractures of the lower third of the tibula and fibula. There is some slight overriding of the tibual fracture. The tibulotalo joint and ankle mortise is probably normal although there may be some posterior dislocation of the lateral malleolus. Past reduction films are not available.

On May 10th at 3:00 p. m., Dr. Walter D. Harris, after reviewing the x-ray, visited the patient and discussed the need for a second operation. The consent was then signed by the patient.

On May 11, 1976 at 1:20 p. m., the patient again returned to the operating room for a closed reduction and long leg cast. X-rays taken through the plaster revealed good position and alignment of the fracture, but about a three/quarter-inch shortening. Following the operation, Mr. Shevak continued to experience severe pain and on May 13, 1976 at 8:20 p. m., complained that his leg felt like it had come apart again. Dr. Harris was called immediately. At 9:00 p. m., an x-ray of the right tibia was done.

From May 15, 1976 to his discharge on May 19, 1976, Mr. Shevak made steady improvement. On May 15, 1976 he sat in his wheelchair from 9:30 a. m. to 11:00 a. m. and on May 16, 1976 he sat in his wheelchair from 3:30 to 4:40 p. m. On May 16, 1976 his leg was x-rayed and on May 17, 1976 he began his visits to physical therapy. On May 17, 1976, Plaintiff was fitted with a pair of auxiliary crutches and, during four visits to physical therapy, he was given crutch walking training.

On May 19, 1976, prior to his discharge, however, Dr. Harris and Dr. Guild reviewed Mr. Shevak's x-rays and decided to wedge his cast to correct an unacceptable increase in the slight posterior angulation of the fracture. X-rays taken following the wedging showed correction of the deformity and adequate alignment of his fracture. Mr. Shevak was released at 1:45 p. m. later that same day. He was told to return to the orthopedic clinic in two weeks for a follow-up. His wife checked out his x-rays at the time her husband was discharged. Mr. Shevak never did return to Carswell for treatment following this admission and discharge.

Following his discharge from Carswell, Mr. Shevak sought treatment from Dr. Arthur Lorber, a civilian orthopedic surgeon. Dr. Lorber x-rayed Mr. Shevak's leg and found good positioning of the fracture when viewed laterally. However, on the AP view, he noted considerable lateral displacement of the distal fragment and an oblique fracture with comminution. Dr. Lorber elected to admit Mr. Shevak to St. Joseph's Hospital and performed a closed reduction with insertion of a Steinmann pin. A long leg cast was again applied. Dr. Lorber noted that when he removed the leg cast applied at Carswell AFB, he found a pressure area caused by wedging. The patient's postoperative course was uneventful except for developing a fever of unknown etiology. He was given antibiotics and discharged home on May 29, 1976. Chest x-rays taken during this admission revealed a healing fracture of the posterior lateral aspect of the right fifth rib, with questionable fracture also of the posterior medial aspect of the left second rib.

On June 24, 1976 Mr. Shevak was again admitted to St. Joseph's Hospital. Dr. Lorber at this time performed a partial ostectomy of the fibula and removed the pins. Mr. Shevak's hospitalization was uneventful and he. was discharged on June 27, 1976. From June 27th, to September 21, 1976, Mr. Shevak had six outpatient visits. On July 1, 1976, Dr. Lorber wedged the patient's cast. On July 22, 1976, the patient complained that he felt his bones moving around. On September 11, 1976 the patient notified Dr. Lorber that he had caught his foot in a locker, but continued walking on it, and that night developed pain. X-rays showed no shift in the fracture. Finally on September 21, 1976, Mr. Shevak told Dr. Lorber that he wanted, if necessary, a bone graft. In view of the motion at the fracture site and the fact that the fracture was five months old, Dr. Lorber agreed to per-

form a bone graft. In each of Mr. Shevak's visits, Dr. Lorber noted that the patient complained of leg pain.

On September 23, 1976, Mr. Shevak was admitted to St. Joseph's Hospital for a bone graft taken from the iliac crest and placed on the tibia. Mr. Shevak's hospitalization was uneventful and he was discharged home on September 29, 1976. The next day, Mr. Shevak was re-admitted to St. Joseph's Hospital for fever of unknown etiology. When admitted, Mr. Shevak had a fever of 99.6 which fell within the normal range after admission. Lab data was unremarkable with the exception of a sedimentation rate of fifty-four which fell to thirty-one during his hospitalization. During this admission, Mr. Shevak was seen by a staff psychiatrist who diagnosed Mr. Shevak's condition as reactive depressive, moderate to severe. The patient was discharged home on October 6, 1976.

Later that day, Mr. Shevak re-entered St. Joseph's Hospital. He was diagnosed as having essential hypertension and acute pulmonary embolization with pulmonary infarction. His admitting physician was Dr. P. J. Goldman. Dr. Goldman noted that Mr. Shevak had a history of chronic alcoholism. The patient was discharged home October 25, 1976 to be followed through outpatient visits.

From the end of October, 1976 until January, 1979, Plaintiff at various times, received treatment from an orthopedic specialist and a pain clinic. [See Plaintiff's Answers to Defendant's Interrogatories, filed of record, January 24, 1979].

## II. Plaintiff Allegations

Plaintiff, Andrew Shevak, Jr. alleges in his complaint:

1. Defendant failed and neglected to diagnose the full nature and extent of the fracture to Complainant's right leg in accordance with the usual and ordinary standards of physicians regularly engaged in practice in the same vicinity, or in similar communities, by adequate use of x-rays, although at the time x-ray equipment was available.

2. Defendant improperly instructed an airman on moving complainant while his leg was in a cast, and through such action, caused the previously set bones in the cast to dislocate.

3. Defendant failed and neglected to accurately determine, following manual manipulation of the radius of Complainant's right leg, whether there was proper alignment and whether the ends of the radius were in such proximity as to insure proper healing thereof, in accordance with the usual and ordinary standards and methods of physicians regularly engaged in practice in the same vicinity, or in similar communities, by adequate use of x-rays and visual inspection of said leg.

4. While Complainant's right leg was in a plaster cast, Defendant failed and neglected, by visual inspection and by the use of x-rays, in accordance with the ordinary standards and methods of physicians regularly engaged in practice in the same vicinity, or in similar communities, to determine whether the radius of Complainant's right leg was in proper alignment.

5. Immediately before and after removing the plaster cast to insert a wedge to hold Complainant's right leg, Defendant failed and neglected to determine in accordance with the usual and ordinary standards of physicians regularly engaged in practice in the same vicinity, or in similar communities, by the adequate use of x-rays and otherwise, whether said radius was in proper alignment and whether it had healed properly and normally throughout its entire circumference.

6. Defendant failed and neglected to diagnose the full nature and extent of the fracture to the ribs of Complainant or treat Complainant for said injury in accordance with the usual and ordinary standards of physicians regularly engaged in practice in the same vicinity, or in similar communities, by adequate use of x-rays, although at the time he had x-ray equipment available in his office.

7. Defendant failed and neglected to properly diagnose and treat Complainant

for pneumonia, in accordance with the usual and ordinary standards and methods of physicians regularly engaged in practice in the same vicinity or in similar communities, by adequate use of x-rays and visual inspection of said right leg.

Therefore, Plaintiff asserts that as a result of the negligence of the Air Force medical personnel, he has incurred and will incur medical expenses; that he has had and will have physical and mental pain, suffering, and anguish; and that he has had a loss of past earnings and will have a loss of future earnings, all in excess of $10,000.00.

### III. Defendant's Response

The physicians at Carswell Air Force Base Hospital provided the proper treatment and care to Andrew Shevak, Jr. during the period May 1, 1976 through May 19, 1976.

### IV. Issues

1. Did the physicians at Carswell Air Force Base Hospital deviate from the recognized medical standard of care in the treatment provided to Andrew Shevak during the period May 1, 1976 through May 19, 1976?

2. If there was any deviation from the recognized standard of care, was such deviation a proximate cause of any injury sustained by Andrew Shevak, Jr.?

3. Did the airmen attending the Plaintiff at Carswell Air Force Base Hospital negligently handle Plaintiff's leg while in the cast so as to dislocate the bones?

4. If the airman was negligent in his handling of Plaintiff's leg, was it a proximate cause of the subsequent injury?

### V. Jurisdiction

The Federal Tort Claims Act, 28 U.S.C. §§ 2671 *et seq.* and 1346(b) (1977) removes the sovereign immunity of the United States from suits in tort and, with specific exceptions, renders the Government liable in the same manner and to the same extent as a private individual. *Richards v.*

*United States*, 369 U.S. 1, 6, 82 S.Ct. 585, 589, 7 L.Ed.2d 492 (1962); *Strauch v. United States*, 637 F.2d 477, 479 n.3 (7th Cir. 1980); *Lachman v. Bank of Louisiana in United States*, 510 F.Supp. 753, 760 (N.D. Ohio E.D.1981). Sovereign immunity is clearly waived when negligent treatment is alleged in a Government hospital. *United States v. Muniz*, 374 U.S. 150, 155 n.9, 83 S.Ct. 1850, 1853, 10 L.Ed.2d 805 (1963). The Act also establishes that before maintaining a suit against the United States, a Plaintiff must present notice of his claim to the appropriate federal agency. *Mack v. Alexander*, 575 F.2d 488, 489 (5th Cir. 1978). When the claim has been denied, or six months have passed, the Plaintiff may then sue in federal court. 28 U.S.C. § 2675(a); *Speer v. United States*, 512 F.Supp. 670, 674 (N.D.Tex.1981).

On October 11, 1977 Plaintiff filed an administrative claim with Carswell Air Force Base as the appropriate federal agency. By letter dated September 1, 1978, the Department of the Air Force denied Plaintiff's claim. The Court, therefore, notes probable jurisdiction.

### VI. Malpractice of Physician

Under the Federal Tort Claims Act, any liability for medical malpractice is controlled by state law. *United States v. Muniz, supra*, 374 U.S. at 162–63, 83 S.Ct. at 1857–1858; *Certain Underwriters at Lloyd's v. United States*, 511 F.2d 159, 161 (5th Cir. 1975); *O'Donnell v. United States*, 428 F.Supp. 629, 632 (W.D.La.1977). Texas law imposes an affirmative burden on the Plaintiff to prove that any negligence of the doctor was a proximate cause of the injury. *Bender v. Dingwerth*, 425 F.2d 378, 381 (5th Cir. 1970). The law also presumes a physician performed his work properly, and does not consider him to be a guarantor or insurer. *Williford v. Banowsky*, 563 S.W.2d 702, 705 (Tex.Civ.App.—Eastland 1978, no writ). Texas law therefore determines the necessary proof to establish the negligence of a physician. *Edwards v. United States*, 519 F.2d 1137, 1139 (5th Cir. 1975), *cert. denied*, 425 U.S. 972, 96 S.Ct. 2170, 48 L.Ed.2d 795

(1976); *Speer v. United States, supra,* 512 F.Supp. at 675.

■■■ In malpractice cases, as applied to this case, Texas law imposes on the treating physician a duty to exercise that degree of care which a general practitioner of ordinary prudence and skill, practicing in the Fort Worth community or a similar community, would have exercised in the same or similar circumstances at that particular time. *See, e.g., Bowles v. Bourdon,* 148 Tex. 1, 219 S.W.2d 779, 782 (1949); *Edwards v. United States, supra,* 519 F.2d at 1139; *Speer v. United States, supra,* 512 F.Supp. at 675. Against that standard, the Plaintiff must therefore prove (1) the negligent act of the Defendant, and (2) such act was a proximate cause of the injury sustained. *Bowles v. Bourdon, supra,* 148 Tex. 1, 219 S.W.2d at 782; *Luna v. Nering,* 426 F.2d 95, 98 (5th Cir. 1970); *Karp v. Cooley,* 349 F.Supp. 827, 835 (S.D.Tex.1972), *affirmed,* 493 F.2d 408 (5th Cir.), *cert. denied,* 419 U.S. 845, 95 S.Ct. 79, 42 L.Ed.2d 73 (1974); *Emanuel v. Bacon,* 615 S.W.2d 847, 849 (Tex.Civ.App.—Houston [1st District] 1981, no writ). To successfully defend against the charge of negligence, a doctor does not have to show that he performed at any "ultimate or maximum" level of care, but only that he conducted himself above or equal to the minimum standard of accepted professional practice. Furthermore, the fact that some other way may be good medical practice does not necessarily establish it as a standard of care that a doctor must follow. There must be supporting expert testimony from the same or similar community. *Compare King v. Flamm,* 442 S.W.2d 679, 681 (Tex.1969), and *Bender v. Dingwerth, supra,* 425 F.2d at 385.

■ Proximate cause may not be established by mere conjecture or speculation, *Farley v. M M Cattle Company,* 529 S.W.2d 751, 755 (Tex.1975); *Karp v. Cooley, supra,* 349 F.Supp. at 839; *Villarreal v. M.G. and Johnnye D. Perry Foun.,* 556 S.W.2d 130, 133 (Tex.Civ.App.—Corpus Christi 1977, writ ref'd n. r. e.), rather the evidence must show at least a reasonable probability that Plaintiff's complications were caused by the Defendant. *Lucas v. Hartsford Acc. and Indemn. Co.,* 552 S.W.2d 796, 797 (Tex. 1977). If the end result of the proffered evidence and testimony is merely that one cause is more likely than other possible causes, the Plaintiff will have failed to carry his burden.

"The proof must establish causal connection beyond the point of conjecture. It must show more than a possibility. Verdicts must rest upon reasonable certainty of proof. Where the proof discloses that a given result may have occurred by reason of more than one proximate cause, and the jury can do no more than guess or speculate as to which was, in fact, the efficient cause, the submission of such choice to the jury has been consistently condemned by this court and by other courts;" quoting from *Ramberg v. Morgan,* 209 Iowa 474, 218 N.W. 492. *Lenger v. Physician's General Hospital, Inc.,* 455 S.W.2d 703, 706 (Tex.1970), and

"Where two causes, the original injury and the improper treatment, are cooperating to produce the final result, plaintiff in order to recover for malpractice must adduce evidence to show that proper treatment would have produced a better result, and the jury cannot be allowed to speculate on the relative amount of injury due to the original injury and that due to malpractice," quoting from 70 C.J.S., Physicians and Surgeons, § 62 at page 995. *Henderson v. Mason,* 386 S.W.2d 879, 884 (Tex.Civ.App.—El Paso 1964, no writ).

■■■ Here, Plaintiff has introduced no written or testimonial evidence by an expert in support of his allegations of Defendant's negligence. Texas law is crystal clear on this point. *Hart v. Van Zandt,* 399 S.W.2d 791, 792 (Tex.1965); *Edwards v. United States, supra,* 519 F.2d at 1139; *Speer v. United States, supra,* 512 F.Supp. at 675; *Henderson v. Mason, supra,* 386 S.W.2d at 882.

"In determining negligence in a case such as this, which concerns the highly specialized art of treating disease, the court and jury must be dependent on

expert testimony. There can be no other guide, and where want of skill and attention is not thus shown by expert evidence applied to the facts, there is no evidence of it proper to be submitted to the jury." *Hart v. Van Zandt, supra,* 399 S.W.2d at 792. A party is bound by the testimony of his own witnesses. A Court can be impressed by either the evidence presented or a lack thereof. When the only expert medical testimony expresses the opinion that Defendant's treatment was not negligent or a proximate cause of the injury complained of [see deposition, placed in evidence, of Dr. Richard E. Jones], and there is no expert opinion to the contrary, a directed verdict for the Defendant is proper. *Hamilton v. Sowers,* 554 S.W.2d 225, 228 (Tex.Civ.App. —Fort Worth 1977, writ dism'd); *Karp v. Cooley, supra,* 349 F.Supp. at 839.

### VII. Malpractice by Airman

The same general principles are applicable to the alleged mishandling by the unnamed airman attendant, *see Scott v. Leigh,* 355 S.W.2d 798, 861 (Tex.Civ.App.— Eastland 1962, writ ref'd n. r. e.). However, as regards this particular cause of action, i.e., the specific allegation of negligence by the unnamed airman, the Plaintiff did attempt to introduce testimony by the wife of the Plaintiff, a licensed vocational nurse, as an expert. Her testimony was elicited through hypothetical questions. These questions assumed facts based solely on her husband's testimony as to how the accident happened.

In reference to the wife's testimony, Dr. Guild, the treating orthopedic surgeon, testified that in his opinion the separation of the bones was caused by muscle spasms. Since the bones were not pinned, such contractions can easily separate them. The doctor further testified that the separation could not have occurred by twisting the leg in moving claimant from the bed to the wheel chair because the cast on claimant's leg extended from the hip, coming down the leg and encasing the foot. The leg inside the cast could not turn independently of the cast.

In view of the doctor's testimony, this Court concludes that Plaintiff has failed to prove by a preponderance of the evidence that the manner in which the airman moved the Plaintiff was negligent and the cause of the bone separation.

### VIII. Conclusion

This Court does not find any negligence under the facts and claims asserted against the Defendant. Judgment will be entered for the Defendant in accordance with this opinion.

IT IS SO ORDERED.