**Alvyn Thomas HOPE and
Beverly Sue Hope**

v.

**SEAHORSE, INC., Seahorse Fleet,
Offshore Crews, Inc. United
States of America.**

Civ. A. No. H–81–3297.

United States District Court,
S.D. Texas,
Houston Division.

Dec. 31, 1986.

Robert Stein and William J. Stradley, Stradley, Barnett & Stein, P.C., Houston, Tex., for plaintiffs.

Robert B. Watts, Bracewell & Patterson, Houston, Tex., for defendants Seahorse, Inc., Seahorse Fleet and Offshore Crews, Inc.

Robert Darden, Asst. U.S. Atty., U.S. Attorney's Office, Houston, Tex., for defendant U.S.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

CARL O. BUE, Jr., District Judge.

### I. *Introduction*

This is a medical malpractice action instituted against the United States by virtue of the Federal Tort Claims Act, 28 U.S.C. §§ 2671–2680 (Supp.1976 and Supp.1981). The United States, in administering medical treatment to Captain Tom Hope pursuant to Title 42 U.S.C.A. Sec. 249, had a duty to provide proper medical diagnosis and treatment as would have been provided by any other health care provider in the State of Texas. Plaintiffs contend that a breach of that duty gives rise to the cause of action at bar.

### II. *Findings of Fact*

1. Captain Alvyn T. Hope was born April 9, 1940. During all times pertinent to this suit he resided in LaMarque, Galveston County, Texas, within the jurisdiction of the United States District Court for the Southern District of Texas.

2. Plaintiff, Beverly Hope, is the surviving widow of Captain Alvyn T. Hope. They were married February 14, 1981. During all times pertinent to this suit she has and still resides in LaMarque, Galveston County, Texas.

3. Plaintiff, Alyssa Nicole Hope, is the surviving daughter of Captain Hope and Beverly Hope. She was born November 23, 1981, and resides with her mother in LaMarque, Galveston County, Texas.

4. Defendant, Seahorse, Inc., is a corporation organized under the laws of the State of Louisiana, and is doing business in the State of Texas and in the Southern District of Texas. This Defendant has property and credits located within the geographical jurisdiction of this Court.

5. Defendant, Offshore Crews, Inc., is a corporation organized under the laws of the State of Louisiana, and is doing business in the State of Texas and in the Southern District of Texas. This Defendant has property and credits located within the geographical jurisdiction of this Court.

6. Defendant, Seahorse Fleet, Inc., is a corporation organized under the laws of the State of Louisiana, and is doing business in the State of Texas and in the Southern District of Texas. This Defendant has property and credits located within the geographical jurisdiction of this Court.

7. On February 18, 1986, Plaintiffs in the case at bar agreed to dismiss their cause of action against Defendants Seahorse, Inc. and Seahorse Fleet, Inc., and Offshore Crews, Inc.

8. Defendant, United States of America, is the proper party defendant responsible for and representing the United States Public Health Service.

9. On or about December 16, 1981, an administrative claim pursuant to the provisions of Title 28, U.S.C.A., Sec. 2671, *et seq.*, was duly filed on behalf of Captain Alvyn T. Hope, Beverly Hope and Alyssa Nicole Hope for injuries and damages sustained by them on account of alleged negligence and malpractice of employees of the United States Public Health Service Hospital at Nassau Bay, Texas, and the United States Public Health Service Clinic at Galveston, Texas.

10. Captain Alvyn T. Hope died on or about July 15, 1982. The cause of death was metastatic cancer of the lung.

11. On or about July 21, 1982, an administrative claim pursuant to the provision of Title 28, U.S.C.A., Section 2671, *et seq.*, was duly filed by Beverly Hope individually and as next friend of Alyssa Nicole Hope for their injuries and damages for the death of Captain Hope.

12. The amount of damages claimed by the Plaintiffs in the administrative claim was in excess of $10,000,000.00.

13. Plaintiff Beverly Hope has qualified as the Independent Executrix of the Estate of Captain Hope and as such is the proper party before this Court representing the estate of her husband.

14. During September, 1979, Captain Hope was employed by Defendant, Offshore Crews, Inc., as Master of the M/V BALTIC SEAHORSE.

15. During September, 1979, Defendant, Seahorse Fleet, Inc., was the owner of the M/V BALTIC SEAHORSE.

16. On or about September 19, 1979, Captain Hope was injured while attempting to maneuver along side a platform in the Gulf of Mexico. The type of work that Captain Hope was performing was work required in the normal course and scope of his duties of employment aboard the M/V BALTIC SEAHORSE.

17. At the time Captain Hope was injured, the M/V BALTIC SEAHORSE was in the navigable waters of the Gulf of Mexico off the coast of Texas.

18. Defendant, Seahorse, furnished Captain Hope with a Master's Certificate for treatment at a United States Public Health Service facility. Captain Hope had a statutory right to such medical treatment as provided by Title 42, U.S.C.A., Section 249.

19. On or about September 20, 1979, upon leaving his ship, Captain Hope presented himself to the United States Public Health Service Hospital at Nassau Bay, Texas, for treatment. He was complaining of pain in the area of his back, shoulder and right chest from the fall occurring on September 19, 1979.

20. The Public Health Hospital and Clinic at Nassau Bay, Texas, was not licensed by the State of Texas as a health care facility at that time or at any other time.

21. Upon Captain Hope's arrival at the hospital, chest x-rays were taken. These x-rays were read at that time by employees of the United States Public Health Service as showing no fractures. Such x-rays did show a slight increased density in the lower right lung as compared to negative chest x-rays taken on June 1, 1978. (Deposition Testimony of Dr. Mary Ann Cross).

22. Captain Hope was informed of these findings and was told by Dr. Cross, his treating physician, that such findings showed he had pneumonia in his right lung. (Deposition Testimony of Captain Hope; Deposition Testimony of Dr. Mary Ann Cross). He was given physical therapy for his back pain and antibiotics for the diagnosed pneumonia condition in his right lung. (Deposition Testimony of Captain Hope). He was not told of any implication of cancer from such finding, nor was he instructed to return for follow-up x-ray examinations in four to six weeks. (Deposition Testimony of Captain Hope).

23. Dr. Mary Ann Cross, Captain Hope's treating physician, compared this x-ray series to his routine chest x-rays taken a year before which showed no such abnormal density. (Deposition Testimony of Dr. Mary Ann Cross). The lung density observed for the first time on this x-ray was an abnormal condition requiring specific medical attention, diagnosis and treatment. (Deposition Testimony of Dr. John Constanzi).

24. Because of the high incidence of lung cancer in the Houston-Galveston area, proper medical practice required that Captain Hope not be lost to follow-up for this abnormal condition. (Deposition Testimony of Dr. John Constanzi).

25. As of September 21, 1979, it was a well-recognized medical fact that the cure rate for lung cancer was significantly higher if such cancer was treated in its initial stages of development.. Captain Hope was then 39 years old and had a life expectancy of 34.9 years. (Deposition Testimony of Dr. John Constanzi).

26. The density observed by the doctors of the Public Health Service on the x-rays taken on September 20, 1979, was cancerous and in reasonable medical probability was in its initial stage and classified as a Stage I cancer. Captain Hope would have a 60–80% chance of surviving for five years. (Deposition Testimony of Dr. John Constanzi and Deposition Testimony of Dr. Robert Smiley); (Testimony of Dr. Charles Stiles).

27. What determines long term survival is the stage of diagnosis of cancer. (Deposition Testimony of Dr. John Constanzi); (Testimony of Dr. Charles Stiles).

28. In reasonable medical probability, had Captain Hope received proper medical treatment he would have a 60–80% chance of surviving for five years and then a 90% chance of surviving an additional five years. (Deposition Testimony of Dr. John Constanzi); (Testimony of Dr. Charles Stiles).

29. Proper medical practice in September, 1979, required that the lung lesion or "spot" be observed on a weekly basis to determine if the lesion was receding in size while maintaining the patient on high levels of antibiotics and anti-inflammatory drugs to treat any infection that may be causing the lesion. Should the lesion not decrease in size in response to this medical treatment, proper medical treatment in the fall of 1979 required that a biopsy or thoracotomy be performed on the lesion itself so that a pathology could be performed on the tissue of the lesion. (Deposition Testimony of Dr. Robert Smiley and Deposition Testimony of Dr. John Constanzi); (Testimony of Dr. Charles Stiles).

30. A thoracotomy involves an incision into the chest wall and the lung for examination of the actual structures within the chest. The lesion or density is removed for analysis to determine if it is cancerous. (Deposition Testimony of Dr. Robert Smiley); (Deposition Testimony of Dr. John Constanzi); and (Testimony of Dr. Charles Stiles).

31. A needle biopsy is performed to determine the cystology of a lesion. (Deposition Testimony of Dr. John Constanzi). The Public Health Service never performed a needle biopsy on Captain Hope.

32. The mortality rate for a thoracotomy is very low. (Deposition Testimony of Dr. Robert Smiley); (Deposition Testimony of Dr. John Constanzi); (Testimony of Dr. Charles Stiles).

33. Captain Hope next had contact with the Public Health Service on April 2, 1980, when he called complaining of continuing pain in his right lower lung. He was seen for this problem on April 4, 1980, at which time a chest x-ray was taken. This x-ray was compared to the x-rays taken seven months before on September 21, 1979. (Deposition Testimony of Dr. Susan Blackwell). A small nodular density was now seen in the area that had been described as an area of "slight increased density" in September of 1979. No other examination or work-up was done at this time. Captain Hope's medical records are void of medical analysis at this point. Captain Hope was told to come back in four to six weeks. (Deposition Testimony of Captain Hope). He was again told by Dr. Cross that the abnormal condition in his right lung was scar tissue from his pneumonia. (Deposition Testimony of Captain Hope); (Deposition Testimony of Dr. Mary Cross).

34. The standard of medical care in this community in April of 1980 would have required that a bronchoscopy and mediastinoscopy be performed on Captain Hope to determine the cause of the nodular density in Captain Hope's right lung. (Deposition Testimony of Dr. Robert Smiley). If the above-mentioned tests were negative for cancer, proper medical practice in this community required that a thoracotomy be performed on Captain Hope. (Deposition Testimony of Dr. Robert Smiley).

35. In Captain Hope's case, by April, 1980, there was unequivocal evidence that there was a cancerous mass present in the right lower lobe of Captain Hope's right lung. (Deposition Testimony of Dr. Robert Smiley). Dr. Smiley read the x-rays taken of Captain Hope in April of 1980 by Public Health Service. Dr. Smiley also read the radiologist reports made of the April, 1980 x-rays taken of Captain Hope by Public Health Service. (Deposition Testimony of Dr. Robert Smiley).

36. Dr. Mary Cross of the Public Health Service relied upon the report of the Public Health Service radiologist that the April 4, 1980 x-rays showing a nodular density represented only a residual problem from the past inflammation. (Deposition Testimony of Dr. Mary Cross).

37. Captain Hope returned to the Public Health Service on April 23, 1980, again complaining of right side chest pain. A

third set of x-rays were taken, again showing the lung lesion to be increasing in density. At this time, tomograms, a specialized type of x-ray, were ordered to get a clearer picture of the nodule.

38. Tomograms were taken by the Public Health Service on April 29, 1980, and reported on April 30, 1980. This fourth set of x-rays showed a well-defined single round nodule measuring approximately 1.5 by 2 cm. with a "tail" extending vertically from the nodule.

39. The words "nodular density" and "nodule" do not describe the same thing. A "density" is anything in the chest that is opaque on an x-ray. A "nodular density" means that the density is now lumpy in shape. A "nodule" means the density is well-defined, usually with a sharp outline. (Deposition Testimony of Dr. Susan Blackwell).

40. Dr. Irene Kennedy first saw Captain Hope on April 23, 1980, at the Public Health Service out-patient clinic in Galveston. His medical history referred to injury in September, 1979, when Captain Hope first started having pain in his right lower chest. His complaint on April 23, 1980 was chest pain in the area of his 7th and 8th ribs on his right side. Captain Hope was also complaining of loss of appetite and fatigue. Dr. Mary Cross had called to the Galveston Clinic to inform them that Captain Hope was coming there for treatment. Dr. Kennedy had Captain Hope's medical records to review. The lesion in Captain Hope's right lung had not been specifically diagnosed as of April 23, 1980. (Deposition Testimony of Dr. Irene Kennedy). The tomograms showed no calcification and no cavitation in the lung nodule. (Deposition Testimony of Dr. Susan Blackwell).

41. The findings from these tomograms are diagnostic for lung cancer. Proper medical treatment required that this lesion be considered as cancerous and surgically removed from Captain Hope's body at that time. Failure to remove the cancerous lesion at that time constituted negligence on the part of the Public Health Service both in its failure to properly diagnose and in its failure to properly treat this life threatening condition. Such negligence was a proximate cause of Captain Hope's prolonged months of suffering and eventual death. (Deposition Testimony of Dr. John Constanzi); (Deposition Testimony of Dr. Robert Smiley); (Testimony of Dr. Charles Stiles).

42. Other tests were conducted in April of 1980 in an attempt to determine possible non-cancerous causes for his tumor. (Deposition Testimony of Dr. Irene Kennedy). These tests showed the nodule to contain no calcium and to have no cavity at its center. Lung lesions with calcium or with cavities are usually associated with causes that are non-cancerous, such as tuberculosis. These negative findings are not diagnostic except that they are compatible with the proper diagnosis that this tumor was cancerous. (Deposition Testimony of Dr. John Constanzi); (Deposition Testimony of Dr. Robert Smiley); (Testimony of Dr. Charles Stiles). The tomograms taken of Captain Hope's tumor were highly indicative of cancer. The nodule was shown to be well demarcated, soft, non-cavitating, and there was no calcium.

The results of the tomogram indicated that the cancerous tumor was at Stage I or at the beginning of Stage II in April of 1980. (Deposition Testimony of Dr. John Constanzi). Proper medical practice in this community dictated that a thoracic needle biopsy be done in April of 1980 in order to determine the cystology of Captain Hope's tumor. The standard of medical care in this community required that the tumor be diagnosed positively. (Deposition Testimony of Dr. John Constanzi); (Deposition Testimony of Dr. Robert Smiley); (Testimony of Dr. Charles Stiles). Proper medical practice required that this lesion be considered to be cancerous until proven otherwise. (Deposition Testimony of Dr. John Constanzi); (Deposition Testimony of Dr. Robert Smiley); (Testimony of Dr. Charles Stiles).

43. On April 30, 1980, Captain Hope was seen by Dr. Ford at the Public Health Service. At that time Captain Hope reported that his appetite was poor and that he

was fatigued, unable to sleep and nervous. The medical records show that Dr. Ford made no physical examination at that time. Captain Hope was prescribed Valium and Tylenol 3 for pain.

44. On May 27, 1980, Captain Hope again returned to the Public Health Service because of his chest pain. Dr. Irene Kennedy saw Captain Hope on that day. Dr. Kennedy did not make a diagnosis of the cause of the nodule but told Captain Hope that the nodule was there. Lung cancer was high on the list for evaluation. This was a possibility that was clearly present since September 1979 inasmuch as Captain Hope was known to be a smoker. Dr. Kennedy referred Captain Hope to the surgery clinic. (Deposition Testimony of Dr. Irene Kennedy).

45. Proper medical practice in Harris County and Galveston County requires that when a general practitioner sees a lung density on an x-ray the doctor must complete whatever tests are necessary to determine what is causing the density to occur. A specific diagnosis is required, whether the doctor sees a nodule or only a lung density. (Deposition Testimony of Dr. Irene Kennedy).

46. Three weeks later, on June 16, 1980, Captain Hope was seen at the Public Health Service surgery clinic. A fifth series of chest x-rays were taken on June 16, 1980, showing the nodule without significant change.

47. On June 16, 1980 Captain Hope saw Dr. Tri Troung, a staff physician in the Public Health Service surgery clinic. The medical records show that Dr. Tri Troung viewed x-rays taken on April 4, 1980, and he thereupon ordered the fifth set of x-rays with Captain Hope to return in a week. (Deposition Testimony of Dr. Tri Troung). The record is again void of medical analysis at this point.

48. On June 23, 1980 Captain Hope returned to the Public Health Service surgery clinic. Captain Hope saw Dr. Tri Troung on that date. Dr. Tri Troung interpreted the June 16th x-rays as showing the persistence of a right base nodule. Arrangements were made for Captain Hope's hospitalization at the Public Health Hospital, Nassau Bay, Texas, on June 30, 1980. Dr. Tri Troung made no diagnosis of the nodule on June 23, 1980, but he was concerned that the nodule was cancerous. (Deposition Testimony of Dr. Tri Troung).

49. On June 30, 1980, Captain Hope was hospitalized for tests to rule out lung cancer as the cause of his chest pain and the tumor in his right lower lung. Dr. Louis reviewed Captain Hope's medical records which indicated that the history of the nodule referred back to September, 1979 when x-rays taken showed a density in the right lung. Dr. Louis reviewed the reports on tomograms taken in April, 1980 which confirmed the presence of the nodule and showed no calcification. Calcification would have been more suggestive of some benign process. However, a negative finding of calcification does not necessarily indicate cancer one way or the other. (Deposition Testimony of Dr. Eugene Louis). This condition implied that the nodule was not tuberculin in nature. Sputum was obtained by asking the patient to cough up a representative specimen of sputum. The sputum tests for cystology and culture for malignancy were negative. There is no way to tell from which area of the lungs sputum is obtained. (Deposition Testimony of Dr. Eugene Louis). The bronchial washings which were more specific than the sputum samples were negative for malignant cells. (Deposition Testimony of Dr. Eugene Louis).

50. A rigid bronchoscopy was done by Dr. Eugene Louis on July 2, 1980. This procedure involved inserting a device into the main airway of the lungs in an attempt to make a visual inspection of the nodule and possibly obtain samples of the tissue for examination. (Deposition Testimony of Dr. Eugene Louis). Because the nodule was located well away from this main airway, no visual inspection of the nodule was made and no samples of its tissue were obtained. Samples of the area of the lung that could be reached by the bronchoscope were obtained and sent to the lab for

study. The results of the bronchoscopy were negative for cancer. The lymph nodes were also studied during this bronchoscopy and were found to be negative for any metastasis of the primary tumor. A sixth series of chest x-rays was taken on July 2, 1980, showing the nodule as unchanged after the bronchoscopy.

51. On July 2, 1980, Captain Hope was discharged from the hospital as fit-for-duty. He was told he did not have lung cancer or cancer of any type, even though the lab studies were not reported back as negative until July 7, 1980. Proper medical treatment required the Public Health Service to consider this lesion to be cancerous until it was proven otherwise. (Deposition Testimony of Dr. John Constanzi); (Deposition Testimony of Dr. Robert Smiley); (Testimony of Dr. Charles Stiles). None of the tests conducted supplied any diagnosis for this tumor other than that it was cancer. A bronchoscopy which was positive for cancer would have been adequate diagnosis to begin treatment for cancer. However, a negative bronchoscopy, which did not even reach the area of the lung in which the lesion was located, proved nothing about the true condition of that lesion. Proper medical treatment required either a biopsy of the lesion or a thoracotomy to remove it and surrounding tissue. Failure to perform either of these procedures was negligence, performance below the required standard of medical practice and a proximate cause of Captain Hope's prolonged months of suffering and eventual death. (Deposition Testimony of Dr. John Constanzi); (Deposition Testimony of Dr. Robert Smiley); (Testimony of Dr. Charles Stiles).

52. On July 17, 1980, Captain Hope returned for a follow-up visit to the Surgery Clinic. At that time, Captain Hope was still experiencing chest pain. (Deposition Testimony of Captain Hope); (Deposition Testimony of Dr. Tri Troung). Captain Hope was given pain medication, released as fit-for-duty and told to return for follow-up in four months. No x-rays or other diagnostic tests were performed. (Deposition Testimony of Dr. Tri Troung).

53. On August 21, 1980, Captain Hope was seen by the Public Health Service for severe pain in his right chest. No diagnosis was made as to the cause for this pain. No x-rays were taken, and no diagnostic tests performed. (Deposition Testimony of Dr. Eugene Louis).

54. On September 11, 1980, Captain Hope was seen for a neurological consultation for the severe chest pain. No chest x-rays were taken and the medical records are void of medical analysis.

55. On October 3, 1980, Captain Hope was again seen for severe chest pain. No x-rays were taken, and no diagnostic tests performed.

56. On October 23, 1980, Captain Hope returned to the Public Health Service complaining of chest pain on the right side. (Deposition Testimony of Dr. Tri Troung). A seventh series of chest x-rays were taken which showed an increase in the density of the nodule. Additionally, it was seen on x-rays that the lung in the area of the nodule was now partially collapsed. However, no studies were conducted. No diagnosis was made for his chest pain, and he was released as fit-for-duty. The area of the lung collapse, called atelectasis, was, in reasonable medical probability, caused by the cancer in his right lung. (Deposition Testimony of Dr. John Constanzi).

57. From October, 1980, through January, 1981, Captain Hope's employment required him to work out of Port Aransas, Texas. During this time period, he sought medical care from the Medical Arts Clinic, Aransas Pass, Texas. Such clinic had a contract with the Public Health Service to provide certain types of health care to seamen to whom the Public Health Service owed a duty. Unless there was an acute medical emergency, all out-patient care that required extensive medical diagnostic work-ups was not to be done by the Medical Arts Clinic, but was to be sent to the Public Health Service directly. (Deposition Testimony of Dr. Elbert Edwardson); (Deposition Testimony of Dr. James W. Roberts).

58. On October 20, 1980, Captain Hope was seen at the Medical Arts Clinic at Aransas Pass, Texas, complaining of chest pain. He told the doctors at that facility that the doctors at the Public Health Service had ruled out cancer as a cause of his right chest pains after the bronchoscopy. His medical records from the Public Health Service were obtained for review of his past treatment. He continued being treated for chest pain in the area of his 8th and 9th ribs on the right side as well as back pain and high blood pressure at the Medical Arts Clinic until February 3, 1981.

59. The doctors at the Medical Arts Clinic relied upon the conclusions reached by the Public Health Service that Captain Hope did not have lung cancer and considered his complaints of chest pain to be non-pleuritic in origin. (Deposition Testimony of Dr. James W. Roberts).

60. On February 9, 1981, Captain Hope returned to the Public Health Service for chronic chest pain, back pain and for high blood pressure. He was referred for physical therapy and for possible bio-feedback therapy for his pain. No x-rays were taken and no diagnosis made for his chest pain.

61. On March 3, 1981, Captain Hope was taken to the emergency room of Memorial Hospital of Galveston County with the on-set of severe chest pain. He was admitted to the hospital by Dr. Charles Merrill Stiles. X-rays were taken showing the left lung to be well expanded and clear. The right lower lung, however, showed considerable increased density with probable pleural effusion. A thoracic surgeon, Dr. Robert Smiley, was called in to consult.

62. On March 5, 1981, Dr. Smiley and Dr. Stiles prepared to perform a bronchoscopy, mediastinoscopy and right thoracotomy. Proper medical practice required that this same series of tests should have been performed on Captain Hope by the Public Health Service as early as the fall of 1979. The bronchoscopy was negative because of the location of the lesion. The mediastinoscopy, however, was positive for lung cancer which had metastasized to the lymph nodes. Dr. Smiley and Dr. Stiles considered the lung cancer to be inoperable. Accordingly, no thoracotomy was performed.

63. In reasonable medical probability, Captain Hope's condition was terminal as diagnosed by Dr. Stiles and Dr. Smiley on March 5, 1981. No medical cure was now possible. (Deposition Testimony of Dr. John Constanzi); (Deposition Testimony of Dr. Robert Smiley); (Testimony of Dr. Charles Stiles).

64. Dr. Stiles and Dr. Smiley compared the x-rays which were taken of Captain Hope during his hospitalization of March 3, 1981, to x-rays taken by the Public Health Service of Captain Hope's lungs since June, 1978. The lung tumor they identified as cancerous is the same tumor which first appeared on the Public Health Service x-rays of September 21, 1979. In reasonable medical probability, such tumor was cancerous when it first was seen on the September 21, 1979 x-rays. (Deposition Testimony of Dr. John Constanzi).

65. Captain Hope was still a Public Health Service patient. He was referred to Dr. John Constanzi at the University of Texas Medical Branch in Galveston, Texas, for cancer treatment. Many other cancer patients have been referred to Dr. Constanzi by the Public Health Service. Dr. Constanzi remained Captain Hope's treating doctor until Captain Hope's death.

66. Captain Hope suffered almost unbelievable agony as the cancer metastasized through his body. In his case, this cancer spread into his skeletal structure. It spread into his ribs on his right side, causing such ribs to break one by one causing almost unbearable pain in spite of medication. (Deposition Testimony of Dr. John Constanzi).

67. After his discharge from Memorial Hospital into the care of Dr. Constanzi, Captain Hope continued to work as a Master for his employer, Offshore Logistics. (Deposition Testimony of Captin Hope). Eventually, he was unable to work because of the pain and the spread of the cancer which made it impossible to properly per-

form his duties. He was ruled unfit-for-duty by Dr. Constanzi after October 22, 1981. (Deposition Testimony of Dr. John Constanzi).

68. Captain Hope was in almost daily pain from April, 1980, up to his death on July 15, 1982. As his cancer spread, his pain increased, requiring ever increasing doses of medication. (Testimony of Mrs. Beverly Hope).

69. Captain Hope was given both radiology and chemotherapy treatments for his cancer in an effort to save his life. Both forms of treatment were painful and disabling. (Deposition Testimony of Dr. John Constanzi).

70. Beverly Hope married Captain Hope two weeks and three days before he was diagnosed as being terminally ill with cancer. During that all too brief honeymoon period, they conceived the child who was born on November 23, 1981. Soon after his diagnosis they were told of the pregnancy. (Testimony of Mrs. Beverly Hope).

71. Beverly Hope cared for Captain Hope throughout his remaining life. She watched his irreversible weight loss and with it his loss of physical strength. She administered medications, when necessary. In short, she watched him die while at the same time watching her baby daughter grow. Beverly Hope suffered extensive emotional pain and grief as a result of her husband's worsening condition. (Testimony of Mrs. Beverly Hope); (Testimony of Dr. Brenda Stone); (Testimony of Dr. Paul Winkleman).

72. Beverly Hope has continued to manifest injury as a result of her husband's death. She has been hospitalized for the emotional impact of his loss and continues to receive medical and psychological treatment because of this loss. (Testimony of Dr. Brenda Stone).

73. Beverly Hope and Alyssa Hope have sustained significant economic and pecuniary losses as a result of Captain Hope's illness and death. Had he received proper medical treatment before the fall of 1980, his economic losses would have been limited to a few weeks of time lost due to this treatment. Instead, by waiting too long to begin treatment, all treatment was futile. He was permanently disabled by October 22, 1981, and unable to work until his death on July 15, 1982. Because of his death, they have lost all economic contributions from those wages that he would have continued to earn the remainder of his life.

74. Beverly and Alyssa Hope have also lost the care, counsel and guidance that Captain Hope would have provided. The effect of the loss of her father has already been realized by Alyssa. This loss will be compounded as she grows up with the knowledge that she never knew her father.

### III. *Conclusions of Law*

1. The Federal Tort Claims Act, 28 U.S.C. § 1346(b), 2671–80 (1970) removes the sovereign immunity of the United States for tortious conduct committed by its employees acting within the scope of their employment and makes the federal government liable in the same manner and to the same extent as a private individual. *Richards v. United States*, 369 U.S. 1, 82 S.Ct. 585, 7 L.Ed.2d 492 (1962); *Speer v. United States*, 512 F.Supp. 670 (N.D.Tex. 1981).

2. The Act provides that as a prerequisite to maintaining a suit against the United States, a plaintiff must present notice of his or her claim to the appropriate federal agency. *Mack v. Alexander*, 575 F.2d 488, 489 (5th Cir.1978). Only when the claim has been denied or six months have passed may a plaintiff bring suit in federal court on the claim. 28 U.S.C. § 2675(a). *Speer v. United States*, 512 F.Supp. 670 (N.D. Tex.1981).

3. This case is properly before this Court pursuant to the provisions of the Federal Tort Claims Act. Title 28, U.S.C. Sec. 2671 *et seq.*

4. This Court has full jurisdiction of all matters in controversy and over all parties pursuant to the provisions of Title 28, U.S.C. Sec. 1346(b).

5. Venue lies in the Southern District of Texas, Houston Division, under the provi-

986

sions of Title 28, U.S.C. § 1402(b), as elements of Plaintiffs' claims concern allegations of negligence at the United States Public Health Service Hospital and Clinic, Nassau Bay, Texas, within Harris County, Texas.

6. The United States Public Health Service Hospital, Nassau Bay, Texas, and the United States Public Health Service Clinic, Galveston, Texas, were owned and operated as agencies of the Defendant United States of America at all times that Captain Hope sought medical treatment from such facilities. The employees of such facilities, including their medical staffs, were agents of Defendant United States of America during all such times.

7. The medical staffs at such facilities during all times pertinent to the treatment of Captain Hope were acting within the course and scope of their employment in the diagnosis and care rendered to Captain Hope.

8. Although this suit is brought in federal court on a federal cause of action, the substantive law of the State of Texas is controlling with respect to the liability of the Defendant United States. *United States v. Muniz,* 374 U.S. 150, 83 S.Ct. 1850, 10 L.Ed.2d 805 (1963); *Richards v. United States,* 369 U.S. 1, 82 S.Ct. 585, 7 L.Ed.2d 492 (1962); *Arrendale v. United States,* 469 F.Supp. 883 (N.D.Tex.1979); *Rise v. United States,* 630 F.2d 1068 (5th Cir.1980); *Speer v. United States,* 512 F.Supp. 670 (N.D.Tex.1981).

9. Texas law therefore determines the proof necessary to establish the negligence of a physician or a hospital. *Edwards v. United States,* 519 F.2d 1137 (5th Cir.1975), *cert. denied,* 425 U.S. 972, 96 S.Ct. 2170, 48 L.Ed.2d 795 (1976).

*The Negligence Standard*

10. In medical malpractice cases, as in other negligence actions, the patient must establish the following elements to recover:

(1) existence of a duty of care

(2) breach of that duty

(3) resulting injury to the plaintiff (proximate cause); and

(4) damages

*Skillern & Sons v. Paxton,* 293 S.W.2d 521, 524–25 (Tex.Civ.App.—Eastland 1956, writ ref'd n.r.e.). The physician's duty of care to the patient usually arises once a physician-patient relationship is established. *Childs v. Weis,* 440 S.W.2d 104, 106 (Tex.Civ.App.—Dallas 1969, no writ).

11. Under Texas law there exists a rebuttable presumption that the physician has properly and fully discharged his duty. *Henderson v. Maron,* 386 S.W.2d 879, 882 (Tex.Civ.App.—El Paso 1964, no writ).

12. The plaintiff-patient must prove that the physician breached his duty and that the breach proximately caused the plaintiff's injuries. *Floyd v. Michie,* 11 S.W.2d 657, 658 (Tex.Civ.App.—Austin 1928, no writ).

13. In *Bowles v. Bourdon,* 148 Tex. 1, 219 S.W.2d 779, 782 (1949) the Texas Supreme Court stated:

It is definitely settled with us that a patient has no cause of action against his doctor for malpractice, either in diagnosis or recognized treatment, unless he proves by a doctor of the same school of practice as the defendant: (1) that the diagnosis or treatment complained of was such as to constitute negligence and (2) that it was a proximate cause of the patient's injuries.

14. What constitutes negligence or medical malpractice is a mixed question of law and fact. *Snow v. Bond,* 438 S.W.2d 549 (Tex.1969). The question of what a reasonable and prudent doctor would have done under the same or similar circumstances must also be determined by the trier of fact after being advised concerning the medical standards of practice and treatment in the particular case. *Id.*

15. The burden of proof is on the patient-plaintiff to establish that the physician-defendant has undertaken a course of conduct or form of treatment which a reasonable and prudent member of the medical profession would not have undertaken

under the same or similar circumstances. The circumstances to be considered include, but are not limited to, the expertise of and means available to the physician and the patient, and the state of medical knowledge. *Hood v. Phillips,* 554 S.W.2d 160 (Tex.1977).

16. Negligent diagnosis cases are based upon the defendant-physician's failure to use adequate procedures in diagnosing the plaintiff's medical condition. In order to recover damages, a plaintiff must show that there was an injurious delay in proper medical treatment or an injurious administration of improper medical treatment as a result of the negligent diagnosis. *See Speer v. United States,* 512 F.Supp. 670, 675 (N.D.Tex.1981), *aff'd,* 675 F.2d 100 (5th Cir.1982). A physician may be held liable in a negligent diagnosis case for (1) failure to perform an appropriate diagnostic test (2) failure to recognize the patient's symptoms as indicative of a particular disease or (3) failure to consult a specialist. *Bender v. Dingworth,* 425 F.2d 378, 381 (5th Cir. 1970); *Emanuel v. Bacon,* 615 S.W.2d 847, 849 (Tex.Civ.App.—Houston [1st Dist.] 1981, writ ref'd n.r.e.).

### Standard of Care

17. The rule enunciated in *Bowles* was relaxed in *Polter v. Pulgear,* 153 Tex. 82, 262 S.W.2d 933 (1953), judgmt. set aside on other grounds, 153 Tex. 82, 263 S.W.2d 689 (1954) to allow the testimony of non-local doctors where the subject of inquiry was common to and equally recognized and developed in all fields of practice. The locality rule requires that the medical proof be from a witness familiar with the practice in the same or similar communities. *Turner v. Stoker,* 289 S.W. 190 (Tex.Civ.App.— Eastland 1926, writ ref'd). The locality rule has been eroded due to the recognition that in most cases the minimal standards of care have become more homogeneous with the development of modern medical education, training, and literature, and that licensing provisions tend to be strict and uniform. *Jeffcoat v. Phillips,* 534 S.W.2d

168 (Tex.Civ.App.—Houston [14th Dist.] 1976).

### Breach of Duty and Causation

18. A plaintiff may recover for a physician's delay in administering the proper treatment, if the plaintiff establishes by expert testimony: (1) that the defendant's diagnostic procedure did not meet the required standard of care; (2) that the plaintiff refrained from seeking proper medical treatment because of the improper diagnosis; (3) that the plaintiff was injured as a result of the delay; and (4) that the delay was the proximate cause of the plaintiff's injuries. *Garza v. Keillor,* 623 S.W.2d 669, 672 (Tex.Civ.App.—Houston [1st Dist.] 1981, writ ref'd n.r.e.); *Chasco v. Providence Memorial Hospital,* 476 S.W.2d 385 (Tex.Civ.App.—El Paso 1972, writ ref'd n.r. e.).

19. Under Texas law, proximate cause consists of two elements, causation in fact and foreseeability. *Marshall v. Joske's Inc.,* 581 S.W.2d 192, 194 (Tex.Civ.App. 1979). Courts hold that whether a negligent act was a proximate cause of the damages suffered by a plaintiff is a question of fact. *Clark v. Waggoner,* 452 S.W.2d 437, 440 (Tex.1970). Foreseeability is established by proof that the actor as a person of ordinary intelligence and prudence should have anticipated the damage to others created by his negligent act. *Id.* at 439–40. Foreseeability does not require anticipation of the precise circumstances that produced the injuries so long as the actor ought to have foreseen in a general way that consequences of a certain kind could result from his actions. Restatement (Second) of Torts § 442B (1965).

20. In medical malpractice cases, the medical expert can testify as to his opinion regarding the cause which produced or probably produced a certain physical condition that exists or has existed. The plaintiff must show at least a reasonable probability that the plaintiff's complications were caused by the doctor's negligence. *Gibson v. Avery, M.D.,* 463 S.W.2d 277 (Tex.Civ. App.—Fort Worth 1970, writ ref'd n.r.e.).

21. A medical expert may draw conclusions as to proximate cause, and the only limits are that the expert must base his/her opinion on reasonable medical probability as opposed to possibility. *Lee Boone v. United Founders Life Insurance Company*, 565 S.W.2d 380 (Tex.Civ.App.—Fort Worth 1978, writ ref'd n.r.e.); *Garza v. Keillor*, 623 S.W.2d 669 (Tex.Civ.App.—Houston [1st Dist.] 1981).

22. It is well settled that a patient has no cause of action against his doctor for malpractice, either in diagnosis or treatment, unless he proves by a doctor of the same school of practice as the defendant that the diagnosis or treatment complained of was negligence and that it was a proximate cause of the patient's injuries. *Hart v. Van Zandt*, 399 S.W.2d 791 (Tex.1965); *Bowles v. Bourdon*, 148 Tex. 1, 219 S.W.2d 779 (1949); *Smith v. Guthrie*, 557 S.W.2d 163 (Tex.Civ.App.—Fort Worth 1977, writ ref'd n.r.e.); *Williams v. Bennett* (Tex. 1981).

23. Texas law imposes on treating physicians a duty to exercise that degree of care which a physician of ordinary prudence and skill, practicing in the same or a similar community, would have exercised in the same or similar circumstances. *Bender v. Dingworth*, 425 F.2d 378, 384 (5th Cir.1970); *Speer v. United States*, 512 F.Supp. 670 (N.D.Tex.1981).

24. A faulty diagnosis can form no basis for a cause of action because in and of itself it results in no damage. *See generally*, Perdue, *The Law of Texas Medical Malpractice*, 28 Hou.L.Rev. 80–86 (1985). However, when a faulty diagnosis leads to injurious delay in receiving a proper treatment or leads to the administering of improper treatment that causes damages, then a negligent diagnosis can form grounds for relief. *Id.*

■ 25. In September, 1979, proper medical practice for the evaluation of this lung lesion required that it be specifically identified as either a cancerous or non-cancerous tumor as quickly as possible. (Deposition Testimony of Dr. John Constanzi and Deposition Testimony of Dr. Robert Smiley).

26. In September, 1979, the standard medical practice for diagnosing the cause of lung pain experienced by a male age 39 years old and a known smoker indicates that the appropriate course of treatment would be to determine the cause of the infiltrate in the lung. (Deposition Testimony of Dr. John Constanzi and Deposition Testimony of Dr. Robert Smiley).

27. The medical care provided to Captain Hope in September, 1979 and the months following was below the standard of medical care in this community and was a proximate cause of his prolonged months of suffering and eventual death. (Deposition Testimony of Dr. John Constanzi); (Deposition Testimony of Dr. Robert Smiley); (Testimony of Dr. Charles Stiles).

28. Had Captain Hope received proper medical care in the fall of 1979, a correct diagnosis of the cancer then in the lower part of his right lung would have permitted treatment which in reasonable medical probability would have eliminated the cancer from his body. (Deposition Testimony of Dr. John Constanzi); (Deposition Testimony of Dr. Robert Smiley); (Testimony of Dr. Charles Stiles).

29. The Public Health Service was negligent in not diagnosing the tumor in Captain Hope's right lung as cancerous. Such a differential diagnosis was required because of the life threatening consequences that would inevitably result from the lesion being cancerous. (Deposition Testimony of Dr. John Constanzi); (Deposition Testimony of Dr. Robert Smiley); (Testimony of Dr. Charles Stiles).

30. Upon obtaining the results of the tomograms taken on April 29, 1980, proper medical practice required that the Public Health Service provide treatment to Captain Hope upon the diagnosis that the nodule in his lung was cancerous until that nodule was proven to be non-cancerous. None of the tests conducted upon Captain Hope during his hospitalization from June 30 to July 2, 1980, proved this nodule to be non-cancerous. (Deposition Testimony of

Dr. John Constanzi); (Deposition Testimony of Dr. Robert Smiley); (Testimony of Dr. Charles Stiles); (Deposition Testimony of Dr. Robert W. Jones). The failure of the bronchoscope to visualize the nodule or recover samples of it required the Public Health Service to immediately perform such tests and examination as would obtain tissue from the lesion itself to determine what types of cells were present in the lesion. (Deposition Testimony of Dr. John Constanzi). The Public Health Service was negligent in its failure since the fall of 1979 to make such studies either by biopsy or thoracotomy. Such failure was below the standard of medical practice in this community. (Deposition Testimony of Dr. John Constanzi); (Deposition Testimony of Dr. Robert Smiley); (Testimony of Dr. Charles Stiles).

31. As of July 2, 1980, Captain Hope was, in reasonable medical probability, still subject to and capable of medical cure. Proper medical treatment upon correct diagnosis required the complete removal of the nodule and surrounding lung tissue, possibly including the right lung. (Deposition Testimony of Dr. John Constanzi); (Deposition Testimony of Dr. Robert Smiley); (Testimony of Dr. Charles Stiles). The Court believes that any medical standard of care, no matter how minimal, required that the physicians institute the appropriate tests to eliminate cancer as the cause of Captain Hope's symptoms.

32. Had the lesion in Captain Hope's right lung been biopsied, there is reasonable medical probability that carcinoma of the lung would have been detected in July 1980. The failure to conduct a biopsy was negligence. A foreseeable result of the physicians' failure to biopsy the lung mass that appeared irregular and possibly cancerous was that it would continue to grow and eventually cause death.

33. The Public Health Service was negligent in failing to properly diagnose Captain Hope's true condition throughout the period of time that Captain Hope remained its patient. Upon discovery of the lung lesion from the x-rays taken on September 21, 1979, the Public Health Service had a duty to properly diagnose and properly treat this condition. Had Captain Hope been given proper medical diagnosis and treatment, in reasonable medical probability, he would have had a 60–80% chance of surviving for five years and then a 90% chance of surviving an additional five years.

34. Such negligence by the Public Health Service physicians in failing to diagnose Captain Hope's true condition and in failing to give him proper treatment was the proximate cause of the excruciating pain, suffering and mental anguish experienced by Captain Hope leading to his eventual death. Proper medical practice also required that the Public Health Service advise Captain Hope that cancer could not be ruled out. By informing Hope unqualifiedly that he did not have cancer, the Public Health Service severely misled him and caused him to be lulled into a false sense of security. As a consequence, he saw no reason to seek a second medical opinion and additional medical care.

35. The Court finds that Plaintiffs in the action at bar have established by a preponderance of the evidence the Defendant's liability for Plaintiffs' injuries. The remaining issue for resolution by the Court is the measure of Plaintiffs' recoverable damages.

### Damages

36. The basis of recovery in the action at bar is found in both the common law and Civil Statutes of the State of Texas.

37. Damages in lawsuits brought pursuant to 28 U.S.C. § 1346(b) and 28 U.S.C. § 2671 *et seq.* are controlled by the law of the state where the negligent act and/or the omission occurred. *Aretz v. United States*, 604 F.2d 417 (5th Cir.1979), reinstated 660 F.2d 531 (1981); *Hess v. United States*, 361 U.S. 314, 80 S.Ct. 341, 4 L.Ed.2d 305 (1960); *Hungate v. United States*, 626 F.2d 60 (8th Cir.1980); *Gard v. United States*, 594 F.2d 1230 (9th Cir.),

*cert. denied,* 444 U.S. 866, 100 S.Ct. 138, 62 L.Ed.2d 90 (1979).

38. The government's negligence and/or acts of omission occurred in this state. Therefore, Texas law applies to the question of damages in the action at bar.

39. Title 28, U.S.C. § 2671 *et seq.,* specifically provides that the United States government shall be liable for damages to the extent permitted by state law. The statute, however, explicitly excludes awards for prejudgment interest and punitive damages. 28 U.S.C. § 2674.

40. The Medical Liability and Insurance Improvement Act, Art. 4590i, TEX.REV. CIV.STAT.ANN. (Vernon 1976), is not applicable to the action at bar because neither the Public Health Hospital at Nassau Bay, Texas, nor the Public Health Clinic at Galveston, Texas, was licensed by the State of Texas as required for coverage under the Act.

41. In *Landers v. B.F. Goodrich Co.,* 369 S.W.2d 33 (Tex.1963), the Texas Supreme Court held that when tortious injuries result in death, there may arise two separate and distinct causes of action: one brought on behalf of the deceased, and the other brought by those close family members who have been injured by their loved one's wrongful death. The right of Plaintiffs to pursue both types of actions against the federal government has been recognized by federal courts. *Stiles v. Union Carbide Corp.,* 520 F.Supp. 865 (S.D. Tex.1981).

### A. *Article 5525—The "Survival" Cause of Action*

42. Article 5525 of the TEXAS CIVIL STATUTES ANNOTATED is commonly known as the "survival statute", and it allows a claimant to bring suit as a representative of the decedent's estate. Pursuant to the provisions of Article 5525, Beverly Hope, as executrix of her late husband's estate, is entitled to recover, on his behalf, those damages which Captain Hope sustained as a result of the Defendant's negligent conduct.

43. By virtue of Article 5525, Beverly Hope, in her capacity as executrix of her husband's estate, should be awarded those damages sustained by Captain Hope as a result of the Defendant's negligent medical treatment. Captain Hope's estate is entitled to recover damages for (1) conscious physical pain, suffering, and mental anguish experienced by Captain Hope prior to his death; (2) lost wages of Captain Hope; (3) future lost earnings of Captain Hope; (4) physical impairment sustained by Captain Hope prior to his death; and (5) physical disfigurement of Captain Hope.

### *Conscious Physical Pain, Suffering, and Mental Anguish*

44. In *Malone & Hyde, Inc. v. Hobrecht,* 685 S.W.2d 739 (Tex.App.—San Antonio 1985, writ granted), the court awarded $250,000.00 for 30 days of conscious pain and mental anguish. The court in *Hausen v. John-Manville Products Co.,* 734 F.2d 1036 (5th Cir.1984), approved a $250,000.00 award for 13 months of conscious physical pain and suffering experienced by a cancer victim. In the case *sub judice,* Captain Hope's physical and mental suffering were proved by both direct and circumstantial evidence. The evidence presented showed that although Captain Hope was prescribed narcotic drugs for his increasing pain, especially during the last months of his life, he suffered agonizing pain despite medication. The evidence further showed that Captain Hope suffered excruciating pain as the cancer spread into his skeletal structure. (Deposition Testimony of Captain Hope); (Deposition Testimony of Dr. John Constanzi); (Testimony of Mrs. Beverly Hope).

45. Captain Hope's knowledge of his impending death and its effects on his family are a proper consideration in determining the amount to be awarded as compensation for mental anguish. *Malone & Hyde, Inc. v. Hobrecht,* 685 S.W.2d at 745. The evidence presented showed that Captain Hope suffered the mental torment of being told his cancer was terminal and that he would not live to see his daughter grow

up. (Deposition Testimony of Captain Hope); (Deposition Testimony of Dr. John Constanzi).

■ 46. The Court will award damages in the amount of $250,000.00 for Captain Hope's conscious physical pain and suffering and for the mental anguish that Captain Hope experienced prior to his death.

### Past Lost Earnings

■ 47. Recovery of a decedent's lost wages in the past are proper elements of damages by virtue of Article 5525, TEX. REV.CIV.STAT.ANN. *Lauders v. Goldrich Co.,* 639 S.W.2d 33 (Tex.1963).

48. The Court finds for Captain Hope in the amount of $22,860.00. (Testimony of Dr. Bean, Economist).

### Future Lost Earnings

49. Under the method of calculation for future lost wages suggested in *Culver v. Slater Boat Co.,* 722 F.2d 114 (5th Cir. 1983) (en banc), *cert. denied, sub nom. St. Paul Fire & Marine Ins. Co. v. Culver,* 469 U.S. 819, 105 S.Ct. 90, 83 L.Ed.2d 37 (1984), a lump sum award for future lost earnings should be discounted to present value in order to provide an amount that will presently compensate the plaintiff. *Brown & Root, Inc. v. DeSantell,* 554 S.W.2d 764, 770–771 (Tex.Civ.App.—Houston [1st Dist.] 1977, writ ref. n.r.e.)

■ 50. Federal courts apply the "unskilled investor" standard in order to discount the future damages award. *Green v. Edwards Company,* 639 F.2d 286 (5th Cir.1981). The "unskilled investor" standard requires the court to calculate the discount to present value provided the discount rate is not computed upon a basis that requires the beneficiaries to exercise investment skill. *Johnson v. Penrod Drilling Co.,* 510 F.2d 234, 240 (5th Cir. 1975), *cert. denied sub nom. Starnes v. Penrod Drilling Co.,* 423 U.S. 839, 96 S.Ct. 68, 46 L.Ed.2d 58 (1975).

51. In other words, the fact finder is required to base the discount on the yield paid by investments in safe securities, without expecting the plaintiff to exercise the skill of a financial expert. *Brown & Root, Inc. v. DeSantell,* 554 S.W.2d at 770–771; *Green v. Edwards Co.,* 639 F.2d at 291.

52. Evidence presented at trial showed that Captain Hope was earning One Hundred Thirty Dollars ($130.00) per day during his employment as Master of a vessel prior to his illness and eventual death. (Testimony of Dr. Bean, Economist), (Deposition Testimony of Captain Hope). The evidence further showed that Captain Hope was employed on a schedule of fifteen (15) days on and fifteen (15) days off. Testimony presented at trial showed that the discount rate to be applied to future lost earnings would be at a rate of .034 per year. (Testimony of Dr. Bean, Economist). Testimony showed that the rate for consumption by Captain Hope would be calculated at twenty (20%) percent.

53. Based on a life expectancy of ten years, (*see* Finding of Fact Number 28), the Court finds that the following damages should be awarded for future loss of earnings:

$130.00 a day  
15 days on/15 days off

| | |
|---|---|
| $ 23,400.00 | annual salary |
| ×10 | yrs of life expectancy |
| $234,000.00 | |
| –79,560.00 | (discount to present value at rate of .034) |
| $154,440.00 | |
| –30,888.00 | (20%–cost for consumption) |

Total loss of future earnings   $123,552.00

### Physical Disfigurement

■ 54. Texas law allows recovery for physical disfigurement as an element of damages. *Texas Industries v. Lucas,* 634 S.W.2d 748 (Tex.App.—Houston [14th Dist.] 1982, rev'd in part, remanded in part). The evidence presented shows that Captain Alvyn Hope suffered physical disfigurement as the cancer mestastisized through his body. Captain Hope suffered severe loss of weight and baldness, during his fifteen month bout with terminal cancer

of the lung. During the last months of his life Captain Hope, who had once been a strong and robust man, now appeared grossly disfigured due to the severe weight loss and baldness associated with terminal cancer and due to the chemotherapy treatments he received in a last effort to live long enough to witness the birth of his daughter, Alyssa Nicole Hope.

55. The Court finds that damages in the amount of $50,000.00 should be awarded for physical disfigurement.

### B. *Article 4671 et. seq.—the "Wrongful Death" Action*

56. Under Texas law a surviving spouse and child may recover damages under the Texas "wrongful death" statute. TEX. REV.CIV.STAT.ANN. art. 4671 (Vernon Supp.1984). The statutory beneficiaries may recover not only their pecuniary losses but also damages for their mental anguish, grief and bereavement, loss of companionship and society or consortium and loss of inheritance. *Sanchez v. Schindler*, 651 S.W.2d 249, 252 (Tex.1983); *Whittlesey v. Miller*, 572 S.W.2d 665, 667 (Tex.1978).

### *Pecuniary Losses*

57. The Court finds that Plaintiff Beverly Hope and her daughter, Alyssa Nicole Hope, are entitled to damages for pecuniary losses sustained as a result of the death of Captain Hope. Under Texas law such losses include the value of maintenance, support, services, and other contributions of a pecuniary nature that Captain Hope would have provided to his wife and child during his reasonable life expectancy. In cases where recovery of unliquidated damages as pecuniary loss is sought on behalf of a surviving spouse, the law rarely, if ever, furnishes a precise legal reason of recovery. *Malone & Hyde, Inc. v. Hobrecht*, 685 S.W.2d at 746.

58. Testimony presented at trial showed that Captain Hope would have provided household services in the amount of $73,607.00 discounted to present value if he had lived until age 70. The Court has determined that evidence presented at trial based on medical probability showed that Captain Hope had a 60%–90% chance of surviving ten years. (*See* Finding of Fact No. 28).

59. The Court awards the Plaintiff, Beverly Sue Hope, damages in the amount of $24,536.00 for loss of household services at a rate of $2,453.56 per year for a period of ten years.

### *Mental Anguish, Grief and Bereavement*

60. Under the Texas Wrongful Death Statute a surviving spouse and children may be compensated for the mental anguish, grief and bereavement suffered as a result of the death of their loved one. *Missouri Pacific Railroad Co. v. Dawson*, 662 S.W.2d 740 (Tex.App.—Corpus Christi 1983, writ ref'd n.r.e.); *Gulf States Utilities Co. v. Reed*, 659 S.W.2d 849 (Tex.App. —Houston [14th Dist.] 1983, writ ref'd n.r. e.). The evidence presented clearly showed that Plaintiff Beverly Hope suffered mental anguish during the last fifteen months of Captain Hope's life as she witnessed his rapid deterioration as the cancer spread through his body. (Testimony of Dr. Brenda Stone); (Testimony of Mrs. Beverly Hope).

61. The Court awards damages in the amount of $125,000.00 to Plaintiff, Beverly Hope, for her past and future mental anguish, grief and bereavement suffered as a result of the death of Captain Hope.

62. The Court awards damages in the amount of $150,000.00 to the minor Plaintiff, Alyssa Nicole Hope, for her future mental anguish, grief and bereavement suffered as a result of the loss of her father, Captain Hope.

### *Loss of Consortium or Society*

63. "Loss of society involves those losses of intimacy and companionship which stem from the marital relationship." *Skidmore v. Grueninger*, 506 F.2d 716 (5th Cir.1975) (footnote 10). The term "society" embraces a broad range of mutual benefits each family member receives from the oth-

er's continued existence including love, affection, care, attention, companionship, comfort, and protection. *Missouri Pacific Railroad Co. v. Vlack*, 687 S.W.2d 414 (Tex.App.—Houston [14th Dist.] 1985, writ filed). The loss of consortium and its constituent elements necessarily involve subjective states incapable of precise translation into a monetary amount. *P.T. & E. Company v. Beasley*, 698 S.W.2d 190 (Tex. App.—Beaumont 1985, writ ref'd n.r.e.). The duty of resolving the monetary value to be placed on the loss falls upon the factfinder. *Whittlesey v. Miller*, 572 S.W.2d at 667.

64. The evidence presented at trial in the case at bar showed that Plaintiff, Beverly Hope, enjoyed a good marital relationship with Captain Hope. The evidence further showed that Plaintiff, Beverly Hope, was very supportive of Captain Hope as she cared for him throughout his remaining life. Upon Captain Hope's death, Plaintiff, Beverly Hope, sustained damage to emotional interests stemming from their marital relationship.

65. The Court awards damages in the amount of $100,000.00 to Plaintiff, Beverly Hope, for loss of consortium suffered as a result of the death of Captain Hope. The Court further awards damages in the amount of $200,000.00 to minor Plaintiff, Alyssa Nicole Hope, for loss of companionship, loss of society, advice, and counsel suffered as a result of the death of her father, Captain Hope.

66. Accordingly, the Court has determined the applicability of the following damage awards:

| | |
|---|---|
| Captain Hope's recovery for conscious pain, suffering, and mental anguish | $ 250,000.00 |
| Captain Hope's past lost earnings | 22,860.00 |
| Captain Hope's future loss of earnings | 123,552.00 |
| Captain Hope's recovery for physical disfigurement | 50,000.00 |
| Beverly Hope's recovery for loss of household services | 24,536.00 |
| Beverly Hope's recovery for mental anguish, grief, and bereavement | 125,000.00 |
| Alyssa Nicole Hope's recovery for future mental anguish, grief, and bereavement | 150,000.00 |
| Beverly Hope's recovery for loss of consortium | 100,000.00 |
| Alyssa Nicole Hope's recovery for loss of companionship, loss of society, advice, and counsel | 200,000.00 |
| TOTAL | $1,045,948.00 |

In the event that the foregoing Findings of Fact also constitute Conclusions of Law, they should be treated as such. In the event that the foregoing Conclusions of Law also constitute Findings of Fact, they are adopted as such.